UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

E-SMART TECHNOLOGIES INC., IVI SMART
TECHNOLOGIES, INC. and BIOSENSOR LLC,

                       Plaintiffs,

           -against-

THELEN REID BROWN RAYSMAN & STEINER LLP
(formerly THELEN REID & PRIEST LLP) and
DAVID B. RITCHIE,

                       Defendants.

-------------------------------------------------------------------x

08 CV 5379

Buchwald, J.

## MEMORANDUM OF LAW IN SUPPORT
## OF PLAINTIFFS' MOTION TO REMAND

DREIER LLP
499 Park Avenue
New York, New York 10022
(212) 328-6100

*Attorneys for Plaintiffs*
*e-Smart Technologies, Inc.,*
*IVI Smart Technologies, Inc.,*
*and Biosensor LLC*

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND...................................................................................................2

ARGUMENT...........................................................................................................................4

I.     The Applicable Standard Of Review................................................................................4

II.    Removal Is Improper Because Plaintiffs Have Not Pleaded
A Federal Cause Of Action And Plaintiffs' Right To Relief
Does Not Depend On Resolution Of A Substantial Question
Of Federal Patent Law...........................................................................................5

     A.     No Federal Cause of Action Has Been Pleaded ....................................................6

     B.     Plaintiffs' Right To Relief Does Not Depend On The
Resolution Of A Substantial Question Of Federal Patent Law ...............................6

CONCLUSION .......................................................................................................................11

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Adamasu v. Gifford, Krass, Groh, Sprinkle, Anderson & Citkowski P.C.*,
    409 F.Supp.2d 788 (E.D. Mich. 2005) ............................................................... 8, 10

*Additive Controls & Measurement System, Inc. v. Flowdata, Inc.*,
    986 F.2d 476 (C.A. Fed (Tex.) 1993) ...................................................................... 10

*Air Measurement Techs., Inc. v. Akin Gump Strauss Hauer & Feld L.L.P.*,
    504 F.3d 1262 (Fed. Cir. (Tex) 2007 ......................................................................... 9

*Altman v. Bayer Corp.*,
    125 F.Supp.2d 666 (S.D.N.Y 2000) .............................................................. 5, 6, 11

*Christianson v. Colt Industrial Operating Corp.*,
    486 U.S. 800 (U.S. Ill. 1988) ..................................................................... 5, 6, 7, 11

*Coditron Corp. v. AFA Protective System, Inc.*,
    392 F.Supp. 158 (S.D.N.Y. 1975) ............................................................................ 9

*Commonwealth Film Processing, Inc. v. Moss & Rocovich*,
    778 F.Supp. 283 (W.D. Va. 1991) ................................................................... 5, 7, 8

*E.R. Squibb & Sons, Inc. v. Accident & Casualty Insurance Co.*,
    160 F.3d 925 (C.A. 2 N.Y. 1998) ............................................................................. 4

*Healy v. Ratta*,
    292 U.S. 263 (U.S. 1934) ......................................................................................... 4

*IMT, Inc. v. Haynes and Boone, L.L.P.*,
    No. 98-CV-2634, 1999 WL 58838 (N.D. Tex 1999) ................................................ 8

*Immunocept, LLC v. Fulbright & Jaworski, LLP*,
    504 F.3d 1281 (C.A. Fed. Tex. 2007) ...................................................................... 9

*Kaufman Malchman & Kirby, P.C. v Hasbro, Inc.*,
    897 F.Supp. 719 (S.D.N.Y. 1995) ............................................................................ 7

*Shamrock Oil & Gas Corp. v. Sheets*,
    313 U.S. 100 (U.S. 1941) ......................................................................................... 5

*U.S. Valves, Inc. v. Dray,*
    212 F.3d 1368 (C.A. Fed. Ind. 2000) ........................................................................9

*University of W. Va. v. VanVoorhies,*
    278 F.3d 1288 (C.A. Fed. W.Va. 2002) ..................................................................9

*Voight v. Kraft,*
    342 F.Supp. 821 (D.C. Idaho 1972) ........................................................................8

*Wilds v. United Parcel Serv., Inc.,*
    262 F.Supp.2d 163 (S.D.N.Y. 2003) ......................................................................5

## STATE CASES

*Comm'rs of State Insurance Fund v. Branicki,*
    2 Misc.3d 972, 775 N.Y.S.2d 443 (N.Y. 2004) ......................................................7

*Kurtzman v. Bergstol,*
    40 A.D.3d 588, 835 N.Y.S.2d 644 (N.Y.A.D. 2 Dept. 2007) .................................6

*New Tek Manufacturing v. Beehner,*
    702 N.W.2d 336 (Neb. 2005) ...............................................................................10

*Pedro v. Walker,*
    46 A.D.3d 789, 847 N.Y.S.2d 666 (N.Y. 2007) ......................................................6

## FEDERAL STATUTES

28 U.S.C. § 1331 ........................................................................................................4

28 U.S.C. § 1338 ..........................................................................................1, 4, 5, 7, 11

28 U.S.C. § 1441 ........................................................................................................4

28 U.S.C. § 1447 ...........................................................................................1, 4, 11

Plaintiffs e-Smart Technologies, Inc. ("e-Smart"), IVI Smart Technologies, Inc.

("IVI"), and Biosensor LLC ("Biosensor" and, collectively with e-Smart and IVI, "Plaintiffs"),

respectfully submit this Memorandum of Law in support of their motion, pursuant to 28 U.S.C.

§ 1447, to remand this action to the Supreme Court of the State of New York, New York County.

## PRELIMINARY STATEMENT

This case arises from the conflicted and negligent legal representation that Thelen

Reid Brown Raysman & Steiner LLP, formerly known as Thelen Reid & Priest LLP

(collectively and individually, "Thelen"), and Thelen partner David B. Ritchie provided to

Plaintiffs.  Plaintiffs first engaged Thelen as patent counsel beginning in 2004, and later

transferred all of their intellectual property matters to Thelen.  As a direct result of Thelen's

deceit, divided loyalties, and gross violations of professional standards and fiduciary duties,

Plaintiffs suffered substantial damages.

Plaintiffs brought the instant action in the Supreme Court of the State of New

York, asserting claims under New York state law for breach of fiduciary duty, legal malpractice,

breach of contract, and aiding and abetting breaches of duty and contract.  Notably, Plaintiffs

have *not* asserted any claims against Thelen based on, arising from, or relating to patent law.

Nor have Plaintiffs asserted any federal causes of action whatsoever in this case.  Furthermore,

resolution of Plaintiffs' claims will not require analysis, construction, or resolution of any patent

related issues.

Thelen nevertheless removed the action based on purported federal patent

jurisdiction pursuant to 28 U.S.C. § 1338.  Because Plaintiffs' action neither arises under federal

law nor requires the resolution of a substantial question of patent law, Thelen's removal clearly

was improper and this action should be remanded to the New York State Supreme Court.

## FACTUAL BACKGROUND

While a detailed description of the underlying facts is set forth in the Complaint, in short, Defendants committed malpractice and breached their fiduciary duty to Plaintiffs as a result of the following:

Thelen and Ritchie persuaded Plaintiffs to entrust all of their critical intellectual property matters to Thelen. Once Plaintiffs did so, however, Thelen failed to provide competent and professional representation to Plaintiffs. Instead, Thelen violated its most fundamental ethical and fiduciary obligations by simultaneously taking on as a client Michael Gardiner ("Gardiner") – a manufacturing consultant and nascent competitor of Plaintiffs. Thelen then actively assisted Gardiner in the theft of Plaintiffs' intellectual property by providing him with access to confidential information concerning Plaintiffs' intellectual property, helping him obtain contractual opportunities that belonged to Plaintiffs, and preparing or revising documents that transferred Plaintiffs' intellectual property and contracts to Gardiner and others working with him.

Instead of helping Plaintiffs resolve these problems, which it helped create, Thelen compounded its misconduct by concealing its role in enabling Gardiner's theft, providing false information to Plaintiffs, and taking positions adverse to Plaintiffs and to the advantage of Gardiner. Thelen also billed Plaintiffs for the legal services that benefited Gardiner.

Thelen finally acknowledged its blatant conflict of interest, but only when *Gardiner's* counsel demanded that Thelen withdraw from litigation between e-Smart and Gardiner because Thelen had represented Gardiner. Even as it withdrew, however, Thelen continued to refuse to disclose to Plaintiffs the extent of its participation in the misappropriation of their intellectual property, citing an "attorney-client relationship" with Gardiner.

Because of Thelen's disloyal actions, Gardiner was able to use Plaintiffs' own work product, technology and confidential information to create a competing business, transforming an e-Smart subcontractor into an aggressive and hostile competitor. In fact, as a result of Thelen's wrongful conduct, Plaintiffs' business operations were effectively derailed for well over a year, as they (i) were forced to expend enormous time and money in litigation in efforts to recover their stolen intellectual property; (ii) were unable to deliver on existing contracts and lost revenues as a result; (iii) struggled to develop new business and financing in the face of a former contractor's claim that he could provide an identical biometric product; (iv) suffered severe damage to their reputation; and (v) together with their shareholders, lost substantial value and equity as their market capitalization fell from greater than $200 million to less than $20 million.

On June 10, 2008, Plaintiffs filed the instant action in the Supreme Court of the State of New York, County of New York, Index No. 08601409. In their Complaint, Plaintiffs allege that Thelen and Ritchie failed to protect the ownership and confidentiality of Plaintiffs' intellectual property by, *inter alia*, making misrepresentations to Plaintiffs; concealing material information; making statements in reckless disregard of their truth or accuracy; disclosing Plaintiffs' confidential information to Gardiner; concealing their adverse representation of Gardiner; and assisting others to pursue objectives that directly conflicted with Plaintiffs' interests. Based on those allegations, Plaintiffs have asserted four causes of action: (i) a First Cause of Action for breach of fiduciary duty; (ii) a Second Cause of Action for legal malpractice; (iii) a Third Cause of Action for breach of contract; and (iv) a Fourth Cause of Action for aiding and abetting breaches of fiduciary duty and contract. A copy of the Complaint is attached hereto as Exhibit A.

3

On June 12, 2008, Defendants filed a notice (the "Notice of Removal") removing this action to federal court pursuant to 28 U.S.C. §§ 1338 and 1441. Defendants' purported basis for removal is that "Plaintiffs' right to relief will necessarily depend on resolution of substantial questions arising under the patent laws of the United States" and that this Court "will necessarily have to decide substantial questions of patent law." *See* Notice of Removal at ¶¶ 5-6. As demonstrated below, Defendants are simply wrong.

## ARGUMENT

### I.

### THE APPLICABLE STANDARD OF REVIEW

Federal courts may entertain a civil action that is based upon a claim or right arising under the Constitution, treaties or laws of the United States. 28 U.S.C. § 1331. Pursuant to 28 U.S.C § 1338(a), upon which Defendants rely, the "district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents." A civil action brought in state court may be removed to federal court only if a federal court could have exercised original jurisdiction in the case. 28 U.S.C. § 1441(a). If, however, an action is removed and the district court lacks subject matter jurisdiction, it must be remanded. 28 U.S.C. § 1447(c).

It is well established that a federal court must proceed with caution in deciding whether it has subject matter jurisdiction. *See Healy v. Ratta*, 292 U.S. 263, 270 (1934) ("Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined."); *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 929 (2d Cir. 1998) ("jurisdiction is not a game . . . it is one of the fundamental tenets of our Constitution that only some cases may be brought in federal court") (*citing Healy*). Thus, federal

4

courts must construe the federal removal statute strictly, and must resolve doubts in favor of remanding cases to state courts. *See Commonwealth Film Processing, Inc. v. Moss & Rocovich*, 778 F. Supp. 283, 286 (W.D. Va. 1991) (*citing Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09 (1941)) (finding that federal court lacked jurisdiction to adjudicate malpractice claim against patent counsel, even where patent "questions" or "issues" might arise).

Accordingly, on a motion to remand, the party seeking to sustain the removal, not the party seeking remand, bears the burden of demonstrating that removal was proper. *See Wilds v. United Parcel Serv., Inc.*, 262 F. Supp. 2d 163, 171 (S.D.N.Y. 2003). In other words, "the party seeking remand is presumed to be entitled to it unless the removing party can demonstrate otherwise." *Id.* (*citing Bellido-Sullivan v. Am. Int'l Group, Inc.*, 123 F. Supp. 2d 161, 163 (S.D.N.Y. 2000)).

## II.

### REMOVAL IS IMPROPER BECAUSE PLAINTIFFS HAVE NOT PLEADED A FEDERAL CAUSE OF ACTION AND PLAINTIFFS' RIGHT TO RELIEF DOES NOT DEPEND ON RESOLUTION OF A SUBSTANTIAL QUESTION OF FEDERAL PATENT LAW

The Supreme Court has established a two-part test to decide whether a case "arises under" federal patent law pursuant to § 1338(a). Jurisdiction extends only to those cases in which a complaint establishes either (i) that federal patent law "creates the cause of action" or (ii) that the plaintiff's right to relief "necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Altman v. Bayer Corp.*, 125 F. Supp. 2d 666, 669 (S.D.N.Y. 2000) (*citing Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988) (same)). Defendants can meet neither of those tests here.

### A.    No Federal Cause of Action Has Been Pleaded

Federal patent law clearly did not "create the causes of action" Plaintiffs have asserted, as Plaintiffs have not pleaded any federal claims in their Complaint. Nor have Defendants asserted otherwise in their Notice of Removal. To the contrary, the Complaint alleges only causes of action that indisputably arise under New York state law. Accordingly, to succeed, Defendants must establish that jurisdiction exists pursuant to the second part of the *Christianson* test: that Plaintiffs' right to relief "necessarily depends on the resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *See Christianson*, 486 U.S. at 809.

### B.    Plaintiffs' Right To Relief Does Not Depend On The Resolution Of A Substantial Question Of Federal Patent Law

To evaluate whether an element of a cause of action "necessarily depends on the resolution of a substantial question of federal patent law," it is necessary "to look at the elements of the claims appearing on the face of the complaint." *Altman*, 125 F. Supp. 2d at 670 (*citing* Hunter *Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1328-29 (Fed. Cir. 1998)).

The elements of each of the claims set forth in Plaintiffs' complaint involve *solely* traditional state law issues. The elements of breach of fiduciary duty are (i) the existence of a fiduciary relationship, (ii) misconduct by the defendant, and (iii) damages that were directly caused by the defendant's misconduct. *Kurtzman v. Bergstol*, 40 A.D.3d 588, 590, 835 N.Y.S.2d 644, 646 (2d Dep't 2007). Legal malpractice requires a showing that (i) the attorney failed to exercise the ordinary skill and knowledge commonly possessed by a member of the legal profession and (ii) the attorney's breach of this duty proximately caused the plaintiff to sustain actual and ascertainable damages. *Pedro v. Walker*, 46 A.D.3d 789, 790, 847 N.Y.S.2d 666, 667 (2d Dep't 2007). The elements of a cause of action for breach of contract are: (i) formation of a

contract between plaintiff and defendant, (ii) performance by plaintiff, (iii) defendant's failure to

perform, and (iv) resulting damages. *Comm'rs of State Ins. Fund v. Branicki*, 2 Misc.3d 972,

976, 775 N.Y.S.2d 443, 446 (N.Y. City Civ. Ct. 2004). Patent law clearly is not "a necessary

element of" of any of these claims. *See Christianson*, 486 U.S. at 809.

Nor does vindication of any of Plaintiffs' state law rights necessarily turn on some

construction of patent law. A cause of action arises under federal patent law when the cause of

action involves the validity, scope, or infringement of a patent. *Kaufman Malchman & Kirby,*

*P.C. v Hasbro, Inc.*, 897 F. Supp. 719, 721 (S.D.N.Y. 1995). Even a cursory review of the

Complaint reveals that none of those concepts are at issue here.

Indeed, numerous courts have rejected efforts to remove malpractice and breach

of contract and fiduciary duty cases involving patents. For example, in *Commonwealth Film,*

*supra*, a client filed a malpractice suit against its attorney for negligently advising it and

litigating on its behalf in connection with patent issues. The attorney-defendant filed a notice of

removal on the purported grounds that the plaintiff's allegations necessarily would require

resolving a substantial question of federal patent law and therefore the federal court had

exclusive jurisdiction over the suit pursuant to 28 U.S.C. § 1338(a). 778 F. Supp. at 284. The

court noted that, while certain of the plaintiff's counts contained allegations that would require a

determination of whether the defendant attorney had demonstrated adequate knowledge of patent

law, "federal patent law did not create the malpractice cause of action nor is it an essential

element of the plaintiff's well-pleaded complaint." *Id.* at 285. The court remanded, noting that

to evaluate a malpractice claim, the court needed only to establish the appropriate standard of

care to which the defendants should be held and then to determine whether the defendants had

met it, and did not need to construe any concepts of patent law. *Id.*

7

The *Commonwealth Film* court cited to another very similar case, *Voight v. Kraft*, 342 F. Supp. 821 (D. Idaho 1972), in which the plaintiffs sued their attorneys for malpractice, because they had allegedly advised their inventor-clients to pursue a patent on a device that was unpatentable. *Id.* The *Voight* court also held that remand was proper, stating:

> The relationship of this suit to patents is happenstance and incidental. The substance of the claim is the alleged tortious conduct of the defendants. The complaint sets up no patent property right which is being infringed, misused, or defeated. . . . Patent law is not an essential ingredient of the case nor does the case require any interpretation of the patent laws and there certainly is no suggestion of any paramount national or federal interest in the dispute between these litigants in what is essentially a common law action sounding in tort.

*Id.* (*citing Voight v. Kraft*, 342 F. Supp. at 822).

In *Adamasu v. Gifford, Krass, Groh, Sprinkle, Anderson & Citkowski P.C.*, 409 F. Supp. 2d 788 (E.D. Mich. 2005), a plaintiff filed a malpractice claim against his former counsel, alleging that it had committed malpractice in connection with the filing of a patent application. The defendants removed the case, arguing – as Defendants do here – that to prove damages in the form of lost royalties and licensing fees as a result of their alleged negligence, the plaintiff would have to demonstrate the scope of the claims in his patent and that users of his invention were infringing his patent. *Id.* at 792. The court rejected that argument and remanded, noting that the only count stated in the complaint, legal malpractice, was a state law tort claim. *Id.*

In *IMT, Inc. v. Haynes and Boone, L.L.P.*, No. 98-CV-2634, 1999 WL 58838, *1 (N.D. Tex. Feb. 1, 1999), the plaintiff alleged that the attorney-defendant had committed malpractice by negligently filing a continuation-in-part of an earlier patent application rather than filing an original application. The malpractice case turned on whether the defendant's errors created a stigma on the patent's marketability from the improperly-filed patent application. *Id.* at *3. Notwithstanding these allegations, the court remanded the action for lack of subject

8

matter jurisdiction, concluding that resolution of the case did not require a determination of patent law, but instead depended only on whether the defendant had given inadequate and substandard advice. *Id.*

While the plaintiffs in the cases discussed above asserted malpractice claims, *Coditron Corp. v. AFA Protective Sys., Inc.*, 392 F. Supp. 158 (S.D.N.Y. 1975), involved a breach of contract claim. In *Coditron*, the plaintiff alleged (i) breach of a patent licensing agreement by failure to pay royalties, (ii) continued manufacture of a patented system after the expiration of the agreement, and (iii) failure to pay for certain services provided under the agreement. *Id.* at 159. The defendant removed the case, asserting that the second cause of action was implicitly grounded on patent infringement, a federal cause of action. *Id.* at 160. Noting that federal jurisdiction "does not extend to all questions in which a patent may be the subject matter of a controversy," the District Court held that the suit "essentially represents a contract dispute notwithstanding the fact that patents are peripherally mentioned." *Id.* at 160-61. In addition, the Court noted that "[i]t is axiomatic that in considering removal, the federal controversy must appear upon the face of the complaint unaided by the answer or the petition for removal." Accordingly, the court remanded the action to the Supreme Court of the State of New York. *Id.*[1]

---

[1]    Those few cases allowing malpractice and/or breach claims to be removed to federal court are factually distinguishable. For example, in *Immunocept, LLC v. Fulbright & Jaworski, LLP*, 504 F.3d 1281, 1284-85 (Fed. Cir. 2007), the court held that there was federal jurisdiction where a malpractice claim asserted that the attorney-defendant had negligently drafted a patent application, resulting in inadequate protection of the plaintiffs' invention. Adjudication of the plaintiffs' claim would, the court held, necessarily require determination of the scope of the patent at issue, thus implicating a substantial question of patent law. *Id.* at 1285 (noting that, "[a]fter all, claim scope determination is the first step of a patent infringement analysis"). Courts also have found federal jurisdiction where a malpractice claim derives from an attorney's performance during patent prosecution and patent litigation, *see Air Measurement Techs., Inc. v. Akin Gump Strauss Hauer & Feld L.L.P.*, 504 F.3d 1262 (Fed. Cir. 2007), where state claims require a comparison of patent applications and proof of invalidity, *see Univ. of W. Va. v. VanVoorhies*, 278 F.3d 1288 (Fed. Cir. 2002), where a breach of contract claim requires proof of patent infringement, *see U.S. Valves, Inc. v. Dray*, 212 F.3d 1368 (Fed. Cir. 2000), or where a business

9

Like the plaintiffs in each of the cases described above, Plaintiffs' claims derive exclusively from state law issues. Specifically, this case turns on whether Defendants committed malpractice and/or breached their fiduciary or contractual duties to Plaintiffs. Determination of these issues will require analysis of questions such as whether Defendants' were reasonably prudent and the nature and extent of their fiduciary and contractual relationships with Plaintiffs. It will not, however, require any analysis of patent law.

Despite the foregoing, Thelen, in its Notice of Removal, alleges that the determination of "Plaintiffs' . . . alleged damages will require the Court to consider and review the scope and breadth of a number of patent applications." Notice of Removal at ¶ 6. That assertion is baseless for two reasons.

First, it simply is false that the Court will have to consider or review patent applications to determine Plaintiffs' damages. Indeed, Plaintiffs' Complaint explicitly states the damages Plaintiffs are seeking and no category of damages requires the Court to consider patent applications.[2]

Second, even had Plaintiffs sought damages that would have required the Court to consider patent applications, the need to consider patent issues for the purpose of determining a plaintiff's damages is *not* sufficient to confer federal jurisdiction. *See Adamasu*, 409 F. Supp. 2d at 792 (rejecting argument that necessity of addressing patent issues to determine damages is sufficient to confer jurisdiction on a federal court); *New Tek Mfg. v. Beehner*, 702 N.W.2d 336,

---

disparagement claim requires proof of patent non-infringement, *see Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 976 F.2d 476 (Fed. Cir. 1993). In sharp contrast to each of the above cases, this case does *not* require determination of the scope, validity or infringement of any patent. Instead, it simply requires an evaluation of Defendants' conduct in connection with its representation of Plaintiffs.

[2]    Plaintiffs' requests for relief in their Complaint ask the Court to (i) declare that Defendants have forfeited the right to compensation for their services to Plaintiffs, (ii) disgorge fees Defendants received from Plaintiffs, (iii) award Plaintiffs the costs and expenses they incurred in litigations that resulted from Defendants' conduct, (iv) award consequential damages, and (v) award compensatory and punitive damages. *See* Complaint at pp. 19-20.

346 (Neb. 2005) (holding that no federal question jurisdiction existed where patent law was

implicated only to the extent that the measure of plaintiff's damages would require consideration

of patent infringement issues).[3]

## CONCLUSION

WHEREFORE Plaintiffs respectfully request that this Court remand the instant

action for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1447.

Dated: New York, New York
         August 18, 2008

DREIER LLP

By: _Joel Chernov_____

Joel Chernov
499 Park Avenue
New York, New York, 10022
(212) 328-6100

*Attorneys for Plaintiffs*
*e-Smart Technologies, Inc., IVI Smart*
*Technologies, Inc. and Biosensor LLC*

---

[3]    Nor would it confer this Court with jurisdiction if Thelen were to raise a defense based on patent law. *See Altman*, 125 F. Supp. 2d at 670. Under the "well-pleaded complaint" rule, whether a claim "arises under" patent law must be determined from what appears in the plaintiff's statement of its own claim, unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose. *Altman*, 125 F. Supp. 2d at 670 (*citing Christianson*, 486 U.S. at 809). Thus, federal question jurisdiction does not exist where a federal question is asserted only as a defense. *See id.* ("a case raising a federal defense does not 'arise under' federal law pursuant to 28 U.S.C. § 1338, even if the defense is anticipated in the complaint, and even if both parties admit that the defense is the only question truly at issue in the case") (internal quotation omitted).

Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x

E-SMART TECHNOLOGIES INC., IVI SMART
TECHNOLOGIES, INC. and BIOSENSOR LLC,

                    Plaintiffs,

        -against-

THELEN REID BROWN RAYSMAN & STEINER LLP
(formerly THELEN REID & PRIEST LLP) and
DAVID B. RITCHIE,

                    Defendants.

-----------------------------------------------------------------------x

Index No. 08601409

**COMPLAINT**

Plaintiffs e-Smart Technologies, Inc. ("e-Smart"), IVI Smart Technologies, Inc. ("IVI"), and Biosensor LLC ("Biosensor" and, collectively with e-Smart and IVI, "Plaintiffs"), by their attorneys, Dreier LLP, for their Complaint, allege as follows:

## Nature of Action

1.    This is a case about the deceit, divided loyalties, and gross violations of professional standards and fiduciary duties by Thelen Reid Brown Raysman & Steiner LLP, formerly known as Thelen Reid & Priest LLP (collectively and individually, "Thelen") and Thelen partner David B. Ritchie ("Ritchie").

2.    As set forth below, Thelen and Ritchie persuaded Plaintiffs to entrust all of their critical intellectual property matters to Thelen. Once Plaintiffs did so, however, Thelen failed to provide competent and professional representation to Plaintiffs. Instead, Thelen violated its most fundamental ethical and fiduciary obligations by simultaneously taking on as a client Michael Gardiner ("Gardiner") -- a manufacturing consultant and nascent competitor of Plaintiffs. Thelen then actively assisted Gardiner in the theft of Plaintiffs' intellectual property by providing

him with access to confidential information concerning Plaintiffs' intellectual property, helping him obtain contractual opportunities that belonged to Plaintiffs, and preparing or revising documents that transferred Plaintiffs' intellectual property and contracts to Gardiner and others working with him. Incredibly, Thelen billed Plaintiffs for the legal services that benefited Gardiner.

3.    Moreover, instead of helping Plaintiffs resolve these issues, Thelen compounded its misconduct by concealing its role in enabling Gardiner's theft, providing false information to Plaintiffs, and taking positions adverse to Plaintiffs and to the advantage of Gardiner.

4.    Thelen finally acknowledged its blatant conflict of interest, but only when *Gardiner's* counsel demanded that Thelen withdraw from litigation between e-Smart and Gardiner because Thelen had represented him. Even as it withdrew, however, Thelen continued to refuse to disclose to Plaintiffs the extent of its participation in the misappropriation of their intellectual property, now citing an "attorney-client relationship" with Gardiner.

5.    As a result of Thelen's disloyal actions, Gardiner was able to use Plaintiffs' own work product, technology and confidential information to create a competing business, transforming an e-Smart subcontractor into an aggressive and hostile competitor.

6.    As a result of Thelen's wrongful conduct, Plaintiffs (i) were forced to expend enormous time and money in litigation with Gardiner in efforts to recover their intellectual property and prevent its unauthorized use; (ii) were unable to deliver on existing contracts and lost revenues as a result; (iii) struggled to develop new business and financing in the face of Gardiner's claim that he could provide an identical biometric product; (iv) suffered severe damage to their reputation based on the claims and conduct of Gardiner; and (v) together with their shareholders, lost substantial value and equity as their market capitalization fell from

greater than $200 million to less than $20 million.  In fact, as a direct result of Thelen's wrongdoing, Plaintiffs' business operations were effectively derailed for well over a year.

## The Parties

7.      Plaintiff e-Smart is a Nevada corporation with its principal place of business located at 526 West 26th Street, New York, New York.

8.      Plaintiff IVI is a Delaware corporation and the parent of e-Smart.  Since 1999, IVI and e-Smart have been engaged in the business of designing, developing, marketing and maintaining biometric identification verification systems that verify a user's identity by comparing the user's fingerprint to stored reference data.

9.      Plaintiff Biosensor is a Hawaii limited liability corporation and a wholly owned subsidiary of IVI.  Biosensor was formed to design and manufacture biometric sensors for use in products manufactured by e-Smart and/or IVI.

10.     Defendant Thelen is a limited liability partnership engaged in the practice of law with offices in New York, California, Connecticut, New Jersey, the District of Columbia and overseas.

11.     Defendant Ritchie is a partner at Thelen and was the attorney in charge of Thelen's representation of Plaintiffs in their patent and intellectual property matters.

## Background

12.     Thelen represents to the general public that it has substantial expertise in the areas of patent and intellectual property law.  Specifically, Thelen represents that (i) it "understand[s] the necessity of devising comprehensive strategies to fully develop the value of IP portfolios;" (ii) "its seasoned attorneys are uniquely positioned to provide the comprehensive services and continuity of legal care increasingly required by these business leaders;" (iii) its "attorneys provide business leaders with the counsel and direction they need to anticipate risks and grow

revenues in order to successfully realize the value of their IP assets;" and (iv) its "clients can

benefit the most from Thelen's coordinated and comprehensive approach . . . where we can

assure that their IP rights will be protected in the best way to facilitate the long term commercial

development and enforcement of their IP portfolio assets." Thelen also represents that:

> Properly identifying and fully developing the commercial value within a
> portfolio of IP assets can seem a complex and challenging process for any
> business. Yet it is a vital one, since the full value of the company's
> investment in its IP portfolio assets may be lost if its rights are not fully
> protected or if management is unaware of all the value-creation options
> available. . . . [O]ur clients can rely on the strength of our sound counsel in
> all aspects of developing the value of their IP portfolios.

*See* http://www.brownraysman.com/index.cfm?section=practice&practice_id=2888) (attached

hereto as Exhibit A).

13.    Based on such claims and representations regarding its expertise, Plaintiffs

engaged Thelen as one of its patent counsel beginning in 2004. At all relevant times, Ritchie

was the Thelen partner in charge of Plaintiffs' patent and intellectual property matters. Ritchie

represented to Plaintiffs that he would oversee all of their matters and that he possessed and

would apply the necessary skill and expertise to protect their intellectual property. He then billed

Plaintiffs at a rate in excess of $500.00 per hour for his services.

14.    It was agreed and understood that Thelen attorneys would report directly to

Plaintiffs' chief executive officer, Mary Grace, keeping her informed regarding Plaintiffs'

intellectual property matters, and from 2004 until the beginning of 2006, Thelen routinely did so.

**Thelen Persuades Plaintiffs To Transfer
All Intellectual Property Matters To It**

15.    Prior to 2006, Plaintiffs had used various law firms for their patent and

intellectual property-related legal work. In or about January 2006, Ritchie persuaded Plaintiffs

to transfer to him all of their other intellectual property matters. Ritchie claimed, *inter alia*, that

4

Fulbright & Jaworski had committed errors in connection with its representation of Plaintiffs, and that he possessed superior expertise and would serve as Plaintiffs' "trusted advisor."

16.    Having been persuaded to transfer all of its intellectual property matters to Thelen, e-Smart completely relied on Thelen to advise and represent it in relation to the protection of the company's most valuable asset: its technology. Plaintiffs provided highly confidential technical information to Thelen attorneys who, in turn, were charged with the protection of that information. Thelen, however, failed to do so.

17.    For example, after convincing e-Smart to transfer its intellectual property work based on its claims that errors were committed by Fulbright, Thelen failed to undertake any comprehensive review of e-Smart's patent portfolio or history of patent preparation and prosecution, failed to evaluate the extent of its patent assignments, failed to obtain assignments of patent applications that Thelen itself prepared, and failed to advise e-Smart that its assignments were incomplete.

**Thelen Fails To Reveal Conflicts Of Interest Or Provide Adequate
Counsel In Connection With Negotiations With Gardiner And A-Card**

18.    Thelen's negligence and breach of duty continued in early 2006, when Thelen purported to represent e-Smart in connection with its negotiations with Gardiner. e-Smart had entered into a tentative agreement with Gardiner pursuant to which he (and the company that he controlled, A-Card) would provide certain manufacturing services to e-Smart. Because Gardiner, in that manufacturing capacity, would obtain broad access to and physical possession of e-Smart's intellectual property and proprietary and confidential information, the protection of its intellectual property required an agreement which would prohibit the misappropriation of that technology.

**Thelen Improperly Represents Gardiner**
**While Simultaneously Representing Plaintiffs**

23.     Upon information and belief, by March 2006, Thelen was aware of Gardiner's efforts to misappropriate Plaintiffs' proprietary information.    Upon information and belief, Thelen also learned that Gardiner had induced Plaintiffs' lead inventor, Tamio Saito ("Saito") (who served as both an officer and director of Plaintiffs and was subject to both nondisclosure and noncompetition agreements with Plaintiffs) as well as other e-Smart engineers to assist him in these wrongful efforts to divert Plaintiffs' technology to Gardiner.

24.     Notwithstanding this knowledge, Thelen proceeded to provide legal services and assistance to Gardiner to the detriment of Plaintiffs.   Beginning in or around March 2006 and unbeknownst to Plaintiffs, Thelen entered into a separate attorney-client relationship with Gardiner and/or Saito.   In connection therewith, Thelen failed to perform a conflict check and obtained a retainer check from Gardiner, but concealed it by hiding it in a desk drawer.   Of course, any such conflict check would have disclosed that Gardiner was adverse to Plaintiffs. Next, in order to hide the work that it then was performing for Gardiner, Thelen failed to open any new matters or create new entries in its filing system in accordance with its normal procedure, instead keeping the work performed for Gardiner in files in the associate's office. Thelen also altered its practice of reporting to Plaintiffs' management.   To add insult to injury, Thelen then billed Plaintiffs for some or all of the services it performed for Gardiner.

**Thelen Improperly Diverts The Arakawa Patent To Gardiner**

25.     Before beginning its formal representation of Gardiner, Thelen had negotiated the assignment to Plaintiffs of a patent application relating to data encryption (the "Arakawa Patent").   All related documents, including the assignment from the inventor, were obtained, prepared, and filed by Thelen in February 2006.   In or about May of 2006, however, at the

7

direction of Gardiner and/or Saito, Thelen prepared a subsequent assignment of the Arakawa Patent transferring it to Aten -- a company owned and controlled by Gardiner. Thelen forwarded this new assignment to the inventor and obtained his signature.

26.    At no time did Thelen advise Plaintiffs' management that it was facilitating the transfer of the patent application from Plaintiffs to a Gardiner-controlled company. Instead, as noted above, it changed its reporting procedures, and excluded Plaintiffs' management from the communications regarding the "reassignment" of the Arakawa Patent.

27.    Ultimately, in June 2006, Ritchie acknowledged that the purported "reassignment" of the Arakawa patent was improper. In a letter to Saito dated July 12, 2006, Ritchie admitted that the purported reassignment was "not proper" given "your status with IVI Smart Technologies." Ritchie then added that the firm could not represent "Aten," the purported assignee, "without permission in writing from another officer of IVI . . ." and that Saito should seek "independent legal counsel" in respect to the reassignment issue.

**Thelen Improperly Transfers Plaintiffs' Contract**
**With John Hopkins University To Gardiner**

28.    Beginning around November 2005, Thelen negotiated a research agreement between Johns Hopkins University ("JHU") and Plaintiffs' subsidiary, Biosensor, relating to the development and testing of a particular biometric sensor. The project involved detailed design and configuration information developed by Saito for Plaintiffs, and was the subject of extensive discussions between Thelen and Saito, and extensive negotiations between Thelen and JHU's counsel.

29.    Discussions relating to the JHU-Biosensor agreement continued in 2006 and, in or about April 2006, a revised draft of the agreement was circulated. The draft agreement

contained confidential information developed by and for Plaintiffs, and Thelen billed all work relating to the negotiation of the agreement to Plaintiffs

30.    Notwithstanding, on or about May 17, 2006, however, Thelen changed the name of the contracting party in the draft agreement from Biosensor to a Gardiner-controlled entity called Polymerbio.

**Thelen Improperly Transfers Additional
e-Smart Patent Applications To Gardiner**

31.    On or about May 1, 2006, Thelen was preparing or had completed preparation of certain new patent applications for Plaintiffs based on information received from Saito and Plaintiffs' other engineers.   But, instead of filing the patent applications with appropriate assignments to Plaintiffs, Thelen handed over the physical applications to Gardiner or others acting in concert with him.   Thelen failed to advise Plaintiffs that it had provided these patent applications to Gardiner and those acting with him.   Thelen did, however, bill Plaintiffs for its legal work relating to the development of those applications.

32.    As a result of Thelen's actions, Gardiner was able to cause the applications to be filed for the benefit of entities under his control, and has since claimed ownership of the inventions described therein.

33.    Based on these actions, and as a direct result of Thelen's failure to perform any due diligence at the time it convinced e-Smart to rely exclusively on Thelen, Plaintiffs have been unable and/or significantly hampered in their ability to obtain the patent assignments to which they are entitled.

**Gardiner Threatens To Enter The Biometric**
**Business Unless Plaintiffs Meet His Demands**

34.    After Thelen undertook its representation of Gardiner and prepared and altered documents enabling Gardiner to obtain control of Plaintiffs' intellectual property and confidential information, Gardiner began taking other steps to launch a competing business. To that end, during May 2006, Gardiner incorporated an entity called ID Smart, arranged for the filing of the patent applications obtained from Thelen, and made arrangements to employ Saito and others that had been affiliated with e-Smart.

35.    In June 2006, Gardiner announced to e-Smart that he had his "own IP," had hired all of the e-Smart research and engineering staff, intended to produce a competing biometric product, and would manufacture for e-Smart only if his terms were met. Gardiner then marketed his supposed product aggressively, contacting prospective purchasers and appearing at industry trade shows with claims that he could provide a product with all of the capabilities of the e-Smart product.

**Thelen's Concealment And Continued Improper Conduct**

36.    During the period June through August 2006, e-Smart turned to Thelen to represent it in connection with its developing dispute with Gardiner and Saito. Ritchie himself purported to be taking steps to assist e-Smart in this regard, including arranging a meeting between all participants. Tellingly, the Thelen associate who had worked on both e-Smart's and Gardiner's matters told Ritchie that she was "uncomfortable" having a meeting to resolve the dispute, because she had been preparing patent applications for Gardiner and the entities he controlled.

37.    During this same period, Thelen concealed its actions on behalf of Gardiner. While Ritchie informed Plaintiffs of certain of Saito's efforts to transfer e-Smart's intellectual

10

property, he failed to disclose that it was Thelen that had prepared and provided Gardiner with the assignment of the Arakawa Patent. He also failed to disclose, *inter alia*, that:

- e-Smart's biometric sensor project had been diverted to Gardiner;

- e-Smart's patents applications had been delivered to Gardiner and/or Saito;

- Thelen failed to prepare or file for e-Smart applications relating to the inventions by Saito and other e-Smart employees and consultants and incorporated in patent applications delivered to Saito and/or Gardiner; and

- Saito and Gardiner had filed patent applications obtained from e-Smart on behalf of Gardiner and entities that he controlled.

38.    In addition, Thelen also falsely stated to Plaintiffs that patent applications had not been filed by Gardiner or Saito, because, according to Thelen, it had convinced Saito that it would violate his fiduciary duties as an officer and director of Plaintiffs.

39.    Although Thelen failed to disclose to Plaintiffs the extent to which it was facilitating Gardiner's misappropriation of Plaintiffs' information and technology, it did insist on payment of all of its outstanding invoices and even sought an additional payment for the future legal services that would have to be rendered to address Gardiner's misappropriation of Plaintiffs' technology. Plaintiffs made those payments, forwarding $200,000 in June to cover outstanding invoices of $150,000 and an additional $50,000 for work to be performed concerning Gardiner.

**Ritchie Persuades Plaintiffs To Let Thelen Handle**
**Litigation That Related To His Own Firm's Conduct**

40.    In September 2006, e-Smart and IVI sued Gardiner and others in the United States District Court for the Northern District of California to recover Plaintiffs' misappropriated property and to prevent its unauthorized use. Before filing that action, Plaintiffs' litigation counsel provided a copy of the complaint to Thelen for its review.

11

41.    Thelen attorneys confirmed the accuracy of the contents of the complaint against Gardiner, but did not disclose to Plaintiffs their knowledge of Gardiner's misappropriation of Plaintiffs' technology and/or their own participation in Gardiner's activities.

42.    Instead of informing Plaintiffs of the transfers of technology which it had facilitated, Thelen sought to conceal its culpability by taking control of the litigation and becoming "coordinating counsel." In fact, Ritchie persuaded Plaintiffs to retain Thelen as their lead counsel in the action against Gardiner, which they did in December 2006.

43.    After Thelen had filed its Notice of Appearance in the Gardiner litigation, Gardiner's counsel sent a letter to Thelen demanding that it withdraw, because of a conflict of interest arising from Thelen's concurrent representation of Gardiner. On January 31, 2007, Thelen withdrew as counsel for Plaintiffs.

44.    At or about the time of Thelen's withdrawal, Plaintiffs asked Thelen to explain its past services for Gardiner. Thelen refused to do so, stating that it had an attorney-client relationship with Gardiner.

45.    Thelen subsequently billed e-Smart more than $100,000 for the firm's work in connection with the Gardiner litigation.

46.    In addition, IVI has become embroiled in litigation commenced by Gardiner against it in the United States District Court for the Southern District of California, costing the company thousands of dollars in legal fees and expenses to date.

**Ritchie's Failures To Adequately Represent Plaintiffs**

47.    Throughout the entire period at issue, Ritchie was the partner in charge of Plaintiffs' patent matters and Plaintiffs relied on Ritchie to represent them diligently and competently. During the period January 2006 through January 2007, Ritchie failed to provide Plaintiffs with proper representation. To the contrary, he knowingly participated in actions that

facilitated Gardiner's misappropriation of Plaintiffs' proprietary technology, and failed to perform, conduct, oversee, review or adequately supervise other Thelen attorneys assigned to Plaintiffs' matters.

48.    In addition, during the period January 2006 through January 2007, Ritchie failed to represent Plaintiffs competently because he had knew or should have known that Saito was engaging in acts adverse to Plaintiffs, that Gardiner was attempting to obtain access to and control of Plaintiffs' technology, and that Thelen attorneys were engaged in conduct adverse to the interests of Plaintiffs, but took no steps to rectify such circumstances.

49.    As a direct and proximate result of Thelen and Ritchie's wrongful conduct, (i) Plaintiffs incurred substantial legal fees and costs, (ii) their proprietary technology was stolen, (iii) business opportunities were lost, (iv) production and delivery of their product was substantially delayed, (v) their receipt of income from their products was substantially and adversely affected, and (vi) they had to incur substantial costs to initiate and prosecute litigation to recover their stolen technology and prevent its misuse by Gardiner and others.

### First Cause of Action
### (Breach of Fiduciary Duty)

50.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 49 as though fully set forth herein.

51.    At all relevant times, defendants had an attorney-client relationship with Plaintiffs. As a result, defendants owed Plaintiffs a duty to exercise due care and diligence to preserve and protect the confidential information received from Plaintiffs. Defendants also owed to Plaintiffs, among other things, duties of loyalty, good faith, trust, candor, and due care, which required them to avoid representing other clients with differing interests from Plaintiffs; to refrain from affirmatively assisting a third-party in taking a position detrimental and adverse to

Plaintiffs; and to refrain from disclosing confidences obtained from Plaintiffs. In addition, as fiduciaries, defendants had a duty to avoid acting in a manner detrimental to the business and property rights of Plaintiffs, including a duty to refrain from making knowing misrepresentations to Plaintiffs, from concealing information from Plaintiffs, and from making statements to Plaintiffs in reckless disregard for their truth and accuracy.

52.    By making misrepresentations to Plaintiffs, by concealing material information, by making statements in reckless disregard of their truth or accuracy, by disclosing Plaintiffs' confidential information to Gardiner, by concealing its adverse representation of Gardiner, and by assisting others to pursue objectives that directly conflicted with Plaintiffs' interests, defendants breached the obligations that they owed to Plaintiffs.

53.    These breaches of duty directly and proximately caused Plaintiffs to experience substantial delays in production of their product and their receipt of revenues, caused Plaintiffs to incur substantial expenses to address the misconduct of Gardiner and others, including the misconduct facilitated by defendants, and caused injury to the reputation and business relationships of Plaintiffs.

54.    As a result of defendant's breaches of their fiduciary obligations to Plaintiffs, (i) Thelen has forfeited any and all right to compensation for its services to Plaintiffs during the time period relevant to these claims and should disgorge all fees it has received from Plaintiffs; (ii) defendants are liable for the costs that Plaintiffs have incurred in litigations with Gardiner; and (iii) defendants are liable to Plaintiffs for consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars, plus compensatory and punitive damages.

## Second Cause of Action
### (Legal Malpractice)

55.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 49 as though fully set forth herein.

56.     By virtue of defendants' attorney-client relationship with Plaintiffs, defendants owed Plaintiffs a duty to exercise due care and diligence by taking reasonable steps to preserve and protect of the confidential information received from Plaintiffs.  Defendants also owed to Plaintiffs, among other things, duties of loyalty, good faith, trust, candor, and due care.  In particular, defendants had a duty to refrain from representing a client whose interests were adverse to Plaintiffs, to avoid and prevent the disclosure and misuse of Plaintiffs' confidential information, to refrain from accepting or engaging in any representation of another client which would interfere with its professional judgments or obligations and relationship to its existing clients, to refrain from assisting a third-party take a position detrimental and adverse to Plaintiffs, and from disclosing confidences obtained from Plaintiffs.

57.     Defendants held themselves out to Plaintiffs as possessing expertise in matters relating to intellectual property, and as being skilled and competent attorneys adhering to professional standards.

58.     Defendants failed to act with the requisite level of skill and competence in their representation of Plaintiffs and breached their duties to Plaintiffs by unreasonably acting in a manner detrimental to the business and property rights of Plaintiffs; by negligently, recklessly, or intentionally disclosing Plaintiffs' confidential information to Gardiner, by making knowing misrepresentations to Plaintiffs; by concealing material information from Plaintiffs that Plaintiffs had a right to learn; by making statements concerning Plaintiffs in reckless disregard for the truth

or accuracy of such statements; and by assisting third-parties to engage in actions adverse to Plaintiffs.

59.    Defendants' breaches of duty and failure to act with the requisite level of skill and competence in their representation of Plaintiffs directly and proximately caused Plaintiffs to experience substantial delays in production of their product and their receipt of revenues, caused Plaintiffs to incur substantial expenses in legal actions to address the conduct of Gardiner and others, including the misconduct facilitated by defendants, and caused injury to the reputation and business relationships of Plaintiffs.

60.    As a result of defendants' legal malpractice, (i) Thelen has forfeited any and all right to compensation for its services to Plaintiffs during the time period relevant to these claims and should disgorge all fees it has received from Plaintiffs; (ii) defendants are liable for the costs that Plaintiffs have incurred in litigations with Gardiner; and (iii) defendants are liable to Plaintiffs for consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars, plus compensatory and punitive damages.

### Third Cause of Action
### (Breach of Contract)

61.    Plaintiffs repeat and allege the allegations set forth in paragraphs 1 through 49 as thought fully set for the herein.

62.    Plaintiffs and Thelen entered into a contract creating an attorney-client relationship between them. Pursuant to its contract with Plaintiffs, Thelen had an obligation to refrain from accepting representation of a client with interests adverse to Plaintiffs without at least asking for Plaintiffs' consent, to avoid and prevent disclosure and misuse of Plaintiffs' confidential information, to refrain from accepting or engaging in any representation of another client which would interfere with its professional judgments or obligations and relationship to

## Fourth Cause of Action
### (Aiding & Abetting Breaches of Fiduciary Duty and Contract)

68.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 49 as though fully set forth herein.

69.    Defendants, at all relevant times, had an attorney-client relationship with Plaintiffs.  As a result, defendants dealt directly with Plaintiffs' lead inventor, Saito, and with other engineers working on behalf of Plaintiffs.

70.    Defendants were aware that Saito served as both an officer and director of Plaintiffs, that he possessed fiduciary duties attendant to those relationships, and that he was subject to both nondisclosure and noncompetition agreements with Plaintiffs.

71.    Defendants were aware that Plaintiffs had expended substantial efforts and resources to protect their confidential information and intellectual property.  Plaintiffs had instructed defendants to take appropriate steps to protect their confidential information and intellectual property.

72.    Starting in no later than March 2006, defendants had knowledge and information that Saito was engaging in conduct that violated his contractual and fiduciary obligations to Plaintiffs.

73.    Defendants acted in breach of their obligations, and facilitated and assisted the misconduct of Saito, by failing to protect the business and property rights of Plaintiffs, by assisting and cooperating with Saito in actions that contravened his duties to Plaintiffs, and by failing to advise Plaintiffs of the actions taken by Saito in contravention of his contractual and fiduciary obligations to Plaintiffs.

74.    By virtue of the acts alleged herein, defendants knowingly participated and substantially assisted in Saito's breach of fiduciary and contractual duties owed to Plaintiffs.

75.    Defendants' aiding and abetting of Saito's breaches of fiduciary and contractual obligations caused damages to Plaintiffs in an amount to be proven at trial, but which are believed to be in excess of one hundred million dollars, plus compensatory and punitive damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against defendants as follows:

A.    On the First Cause of Action against defendants, (i) declaring that defendants have forfeited any and all right to compensation for its services to Plaintiffs during the time period relevant to these claims; (ii) directing that Thelen disgorge all fees it has received from Plaintiffs; (iii) awarding Plaintiffs the costs and expenses that they have incurred in litigations that have resulted as a result of Defendants' conduct; (iv) awarding Plaintiffs consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars; and (v) awarding compensatory and punitive damages.

B.    On the Second Cause of Action against defendants, (i) declaring that defendants have forfeited any and all right to compensation for its services to Plaintiffs during the time period relevant to these claims; (ii) directing that Thelen disgorge all fees received from Plaintiffs; (iii) awarding Plaintiffs the costs and expenses that they have incurred in litigations that have resulted as a result of defendants' conduct; (iv) awarding Plaintiffs consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars; and (v) awarding compensatory and punitive damages.

C.    On the Third Cause of Action against Thelen, (i) awarding Plaintiffs the costs and expenses that they have incurred in litigations that have resulted as a result of Thelen's conduct;

(ii) awarding Plaintiffs consequential damages in an amount to be proven at trial but believed to be in excess of one hundred million dollars; and (iii) awarding compensatory damages.

D.      On the Fourth Cause of Action against defendants, (i) awarding Plaintiffs the costs and expenses that they have incurred in litigations that have resulted as a result of defendants' conduct; (ii) awarding Plaintiffs consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars; and (iii) awarding compensatory and punitive damages.

E.      Awarding Plaintiffs their costs, attorneys' fees, prejudgment interest and such other and additional relief as the Court deems just and proper.

Dated: New York, New York
       June 10, 2008

                                        DREIER LLP

                                        By: _____
                                             Joel Chernov
                                             Brian Dunefsky
                                        499 Park Avenue
                                        New York, New York, 10022
                                        (212) 328-6100

                                        *Attorneys for Plaintiffs*
                                        *e-Smart Technologies, Inc., IVI Smart*
                                        *Technologies, Inc. and Biosensor LLC*

20

# EXHIBIT A

Thelen Reid Brown Raysman & Steiner LLP, an International Law Firm                    Page 1 of 2

English  |  Chinese

# Thelen Reid Brown Raysman & Steiner LLP
## Intellectual Property

Businesses involved in commercially developing their own intellectual property (IP) portfolio assets, and those relying on the use of IP assets owned by others, face many risks arising from the growing variety and complexity of IP assets, increasing global competition, and diversity in protections afforded IP rights in foreign markets.

In today's environment, businesses must assert greater control over those risks. The IP attorneys of Thelen Reid Brown Raysman & Steiner LLP understand the necessity of devising comprehensive strategies to fully develop the value of IP portfolios across asset classes and geographic markets, and of assuring the contract rights of our clients whose businesses depend on the permitted commercial development of another party's IP.

Thelen's seasoned attorneys are uniquely positioned to provide the comprehensive services and continuity of legal care increasingly required by these business leaders. Our IP attorneys collaboratively apply their respective experience in the areas of patents, trademarks, copyrights, trade secrets, and competition law.

Our clients benefit from our ability to offer both the focused experience of a boutique and the extensive multi-disciplinary resources of a full-service national firm. Thelen's attorneys provide business leaders with the counsel and direction they need to anticipate risks and grow revenues in order to successfully realize the value of their IP assets.

With experienced IP attorneys strategically located in major centers of commercial activity nationwide, we provide our clients with cost-effective legal service through seamless coordination between our offices coast-to-coast. Our IP attorneys are backed by the full multi-disciplinary resources of the firm, and can confidently handle any type of IP-related matter, in any jurisdiction, and at any stage in the growth and development of our clients' IP assets.

### Acquiring and Protecting IP Rights
The acquisition and protection of IP rights represents the initial-and perhaps most critical-stage in developing the full value of any company's portfolio of IP assets. It is at this stage that our clients can benefit the most from Thelen's coordinated and comprehensive approach, and where we can assure that their IP rights will be protected in the best way to facilitate the long-term commercial development and enforcement of their IP portfolio assets.

Using our collective experience in a team approach, Thelen provides forward-looking strategic counsel to clients across many industries regarding the types of protection available for a given technology or creative work. Where appropriate, we evaluate the benefits, costs, time considerations, and consequences of pursuing various combinations of protection that will best fit our clients' business objectives. Thelen's nationwide network of offices are seamlessly coordinated to provide integration of practice capabilities and achieve cost-effective services for our clients.

### Managing and Developing the Value of IP Rights and Assets
Properly identifying and fully developing the commercial value held within a portfolio of IP assets can seem a complex and challenging process for any business. Yet, it is a vital one, since the full value of a company's investment in its IP portfolio assets may be lost if its rights are not fully protected or if management is unaware of all the value-creation options available. A company's effectiveness in meeting these challenges reflects directly on its management, and failure can place the company at a competitive disadvantage.

Thelen's attorneys help our clients face these challenges by obtaining broad protection of their IP rights in ways that anticipate and facilitate the commercial development of those assets for maximum return, and provide our clients with the counseling and transactional services they need to manage and develop the value of their IP portfolio assets across the different classes of protection and in the various forms of economic activity in which they may appear.

We have found that an effective strategy often includes conducting comprehensive value audits of client IP portfolios, which can