PATTERSON BELKNAP WEBB & TYLER LLP
Philip R. Forlenza
Michael J. Timmons
Diana Breaux
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2000
Attorneys for Defendants
Thelen Reid Brown Raysman & Steiner LLP and David B. Ritchie

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

E-SMART TECHNOLOGIES INC.,          :
IVI SMART TECHNOLOGIES, INC. AND    :
BIOSENSOR LLC,                      :
                                    :
                    Plaintiff,      :          08 CV 5379 (NRB) (DFE)
                                    :
        v.                          :
                                    :
THELEN REID BROWN RAYSMAN &         :
STEINER LLP and DAVID B. RITCHIE,   :
                                    :
                    Defendant.      :
------------------------------------------------------------ X

## MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTION TO REMAND

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ............................................................................................................3

I.    Patent Issues are Critical to Plaintiffs' Allegations ..........................................3

      A.    Thelen and Ritchie were Plaintiffs' Patent Counsel ................................3

      B.    Saito Instructed Thelen in the Handling of Patent Applications.............................4

      C.    Plaintiffs Allege That Thelen Mishandled Their Patent Applications....................5

II.    The Applicable Law Requires Federal Jurisdiction in This Case ........................................5

      A.    The Federal Courts have Exclusive Jurisdiction Over Cases That Implicate Substantial Questions of Patent Law .......................................5

      B.    Because Plaintiffs Must Prove the Amount of Damages, They Must Prove the Validity and Claim Scope of the Patent Applications.......................................7

      C.    In Order to Decide Causation, the Court Must Decide Inventorship and Infringement..............................................................11

           1.    Plaintiffs' Alleged Harm Stems From Gardiner's Entry into the Market as a Competitor..........................................................11

           2.    Plaintiffs' Claims Require the Court to Determine Inventorship...............12

           3.    Plaintiffs' Claims Require the Court to Determine Infringement ..............14

CONCLUSION.......................................................................................................16

## TABLE OF AUTHORITIES

### CASES

*Adamsu v. Gifford, Krass, Groh, Sprinkle, Anderson & Citkowski, P.C.*,
409 F.Supp.2d 788 (E.D. Mich. 2005)..............................................................9

*Air Measurement Tech., Inc. v. Akin Gump Strauss Hauer & Feld*,
504 F.3d 1262 (Fed. Cir. 2007)..............................................6, 7, 8, 9, 10, 15

*Ambriz v. Kelegian*,
146 Cal. App. 4th 1519 (2007) ...........................................................11

*Board of Regents v. Nippon Tel. & Tel. Corp.*,
414 F.3d 1358 (Fed. Cir. 2005).........................................................13

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
40 F.3d 1223 (Fed. Cir. 1994)...........................................................13

*Chopra v. Townsend, Townsend & Crew LLP*,
No. 07 CV 02447 (MSK/MEH), 2008 WL 413944 (D. Colo. Feb. 13, 2008) ...............8, 9

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988).............................................................3, 6, 13

*In re Comisky*,
499 F.3d 1365 (Fed. Cir. 2007)............................................................8

*Fina Oil & Chem. Co. v. Ewen*,
123 F.3d 1466 (Fed. Cir. 1997)...........................................................13

*Frank's Casing Crew & Rental Tools, Inc. v. PMR Technologies, Ltd.*,
292 F.3d 1363 (Fed. Cir. 2002)...........................................................13

*Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (2005)......................................................................6

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
153 F.3d 1318 (Fed. Cir. 1998).......................................................6, 13

*Immunocept, LLC v. Fullbright & Jaworski, LLP*,
504 F.3d 1281 (Fed. Cir. 2007)..............................................6, 7, 8, 9, 10, 15

*MCV Inc. v. King-Seeley Thermos Co.*,
870 F.2d 1568 (Fed. Cir. 1989)...........................................................13

*Midwest Industries, Inc. v. Karavan Trailers, Inc.*,
175 F.3d 1356 (Fed. Cir. 1999)............................................................6

*New Tek Mfg., Inc. v. Beehner,*
  702 N.W.2d 336 (Neb. 2005)................................................................10

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005).............................................................8

*In re Tamoxifen Citrate Antitrust Litig.,*
  222 F.Supp.2d 326 (E.D.N.Y. 2002) .....................................................6

*U.S. Valves, Inc. v. Dray,*
  212 F.3d 1368 (Fed. Cir. 2000).............................................................6

*Viner v. Sweet,*
  30 Cal. 4th 1232 (2003) ......................................................................11

## **STATUTES**

35 U.S.C.§ 102 ....................................................................................8

35 U.S.C.§ 103 ....................................................................................8

35 U.S.C. § 262....................................................................2, 12, 14

35 U.S.C. § 271..................................................................................15

28 U.S.C. § 1338 (a) ............................................................................5

## PRELIMINARY STATEMENT

Defendants Thelen Reid Brown Raysman & Steiner LLP and David B. Ritchie (collectively, "Thelen") oppose Plaintiffs e-Smart Technologies Inc., IVI Smart Technologies, Inc., and Biosensor LLC's (collectively, "Plaintiffs") motion to remand this action to the Supreme Court of New York. Plaintiffs deny that this case has anything to do with patents, claiming that they "have *not* asserted any claims . . . based on, arising from, or relating to patent law." Memorandum of Law in Support of Plaintiffs' Motion to Remand ("Plaintiffs' Br.") at 1.

To the contrary, the entire case turns around the alleged wrongful transfer of intellectual property, specifically a number of patent applications, to a "nascent competitor of Plaintiffs," Michael Gardiner ("Gardiner"). Complaint (Ex. 1 to this brief) at ¶¶ 2, 31-32 and 37.

Plaintiffs' causes of action all require that Plaintiffs prove that (1) but for Thelen's actions they would not have been harmed, and (2) the amount of damages. Plaintiffs' Br. at 6-7. As a result of the alleged mishandling of the patent applications by Thelen, Plaintiffs claim consequential damages "in excess of one hundred million dollars." Ex. 1 at ¶¶ 60, 67 and 75. Plaintiffs' allegations require the Court to decide a number of substantial issues of patent law, providing this Court with exclusive jurisdiction over the case.

The first substantive issue of patent law arises in the context of the *amount* of damages suffered by Plaintiffs. The Court must decide the validity and claim scope of the patent applications allegedly wrongfully provided to Gardiner. In order to support a claim for "in excess of one hundred million dollars," plaintiff must prove that the patent applications at issue (1) are valid and enforceable, and (2) are of sufficient scope to provide significant protection from competitors in the market. An invalid or unenforceable patent, or a narrow or inapposite

1

patent that does not provide significant protection, certainly cannot support the claim for the astronomical damages sought in this case.

The second and third substantive issues of patent law arises in the context of the requirement that Plaintiffs prove that *but for* Thelen's alleged actions, Plaintiffs would not have been harmed. According to Plaintiffs' complaint, the harm allegedly suffered by Plaintiffs occurred because Gardiner allegedly took Plaintiffs' intellectual property and was able to "create a competing business, transforming an e-Smart subcontractor into an aggressive and hostile competitor." Ex. 1 at ¶¶ 5-6 and 34-35. According to the Complaint, Gardiner was able to provide an "identical biometric product" and a "product with all of the capabilities of the e-Smart product." *Id.* at ¶¶ 6 and 35.

Plaintiffs must prove that *but for* Thelen's actions, Gardiner could not have done what they allege he did, i.e., compete with Plaintiffs. Otherwise, any damages suffered by Plaintiffs were not caused by Thelen's actions. The *but for* requirement raises two additional substantial issues of patent law.

First, Gardiner is named as a co-inventor on at least some of the applications in dispute. As a co-inventor he could use his invention without accounting to e-Smart. 35 U.S.C. § 262. If he isn't a co-inventor, he will not have these rights. The Court will have to determine inventorship of the applications in dispute.

Second, the Court must perform an infringement analysis to determine whether Gardiner is infringing any claims of the patent applications in dispute. If he is, and he has no rights as a co-inventor, Plaintiffs would be able to preclude him from entering the market. If he is not, Plaintiffs have no recourse.

Claim scope, validity, enforceability, inventorship, and infringement are all substantial questions of federal patent law. Because this Court has *exclusive* jurisdiction over these issues, it should not remand this case to a state court that has neither has the experience nor the authority to handle substantial patent issues.

There is another, practical, reason why this Court should reject Plaintiffs' motion to remand to state court. It is to avoid the waste of judicial resources. The law provides for *exclusive* jurisdiction in Federal Court when "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808-09 (1988). If the Court grants remand and then at some later time it becomes clear that the case necessarily depends on an issue that depends on a substantial issue of patent law, the *state court will not have jurisdiction over the case*. This case may be back in this Court after years in state court. The Court should not remand the case based on the prevalence of substantial patent issues.

## ARGUMENT

### I.    Patent Issues are Critical to Plaintiffs' Allegations

This case relates to Thelen's conduct as patent counsel, and its alleged mishandling of patent applications. In effort to remand this case to state court, Plaintiffs try to distance themselves from the operative facts and the issues of patent law raised by its complaint. But try as they might, Plaintiffs cannot run away from these facts.

### A.    Thelen and Ritchie were Plaintiffs' Patent Counsel

Plaintiffs allege that "Thelen represents to the general public that it has substantial expertise in the *areas of patent and intellectual property law*" and that "[b]ased on such claims and representations regarding its expertise, Plaintiffs engaged Thelen as one of its *patent counsel* beginning in 2004." Ex. 1 at ¶¶12-13 (emphasis added).

3

> At all relevant times, Ritchie was the Thelen partner in charge of
> Plaintiffs' *patent and intellectual property matters*. Ritchie
> represented to Plaintiffs that he would oversee all of their matters
> and that he possessed and would apply the necessary skill and
> expertise *to protect their intellectual property*. Ex. 1 at ¶ 13
> (emphasis added).

Plaintiffs also plead that they "completely relied on Thelen to advise and

represent it in relation to the protection of the company's most valuable asset: its technology."

Ex. 1 at ¶16.  In fact, Plaintiffs' first allegation is that when Thelen became Plaintiffs' exclusive

patent counsel, Thelen failed to undertake review of e-Smart's patent portfolio. Ex. 1 at ¶ 17.

### B.    Saito Instructed Thelen in the Handling of Patent Applications

According to Plaintiffs, Tamio Saito ("Saito"), Plaintiffs' "lead inventor" and "an

officer and director of Plaintiffs," was complicit in the alleged theft of patent applications by

Gardiner. Ex. 1 at ¶¶ 23, 69-75.  Saito was the sole contact with Thelen with regard to Plaintiffs'

patent applications. Ex. 1 at ¶¶ 69-70.  Saito was working directly with and gave instruction to

Masako Ando ("Ando"), an associate at Thelen at all relevant times.  Ando followed Saito's

instructions with regard to all of Plaintiffs' patent applications.[1]

By February of 2006, Gardiner's company, A-Card, was a manufacturing entity

working with Saito to manufacture product for e-Smart. Ex. 1 at ¶ 18.  Saito instructed Thelen to

draft and, as e-Smart's representative, entered into a "Letter of Intent" with A-Card in February

2006 that addressed a proposed manufacturing arrangement between e-Smart and A-Card. This

Letter of Intent, although non-binding, was directed in part to establishing rights between the

parties with regard to inventions, patent applications and patents resulting from the agreement.

Ex. 3.

---

[1] Thelen denies the allegation that by March 2006, it "had knowledge and information that Saito
was engaging in conduct that violated his contractual and fiduciary obligations to Plaintiffs." Ex.
1,  Complaint at ¶ 72 & Ex. 2, Answer at ¶ 72.

**C.     Plaintiffs Allege That Thelen Mishandled Their Patent Applications**

The alleged wrongful transfer of patent applications to Gardiner occurred in May 2006, after Saito and Gardiner entered into this Letter of Intent.  According to the complaint:

> Thelen was preparing or had completed preparation of certain new patent applications for Plaintiffs based on information received from Saito and Plaintiffs' other engineers.  But, instead of filing the patent applications with appropriate assignments to Plaintiffs, Thelen handed over the physical applications to Gardiner or others acting in concert with him.  Thelen failed to advise Plaintiffs that it had provided these patent applications to Gardiner and those acting with him. Ex. 1 at ¶ 31; *see also* ¶ 37.

In addition, "[a]s a result of Thelen's actions, Gardiner was able to cause the applications to be filed for the benefit of entities under his control, and has since claimed ownership of the inventions described therein. . . . Plaintiffs have been unable and/or significantly hampered in their ability to obtain the patent assignments to which they are entitled." Ex. 1 at ¶¶ 32-33.

Finally, according to the Complaint, "Thelen failed to prepare or file for e-Smart applications relating to the inventions by Saito and other e-Smart employees and consultants and incorporated in patent applications delivered to Saito and/or Gardiner." Ex. 1 at ¶ 37.

**II.     The Applicable Law Requires Federal Jurisdiction in This Case**

**A.     The Federal Courts have Exclusive Jurisdiction Over Cases That Implicate Substantial Questions of Patent Law**

Federal law provides that federal courts "shall have original jurisdiction of any civil action *arising under* any Act of Congress relating to patents" and that "[s]uch jurisdiction shall be exclusive of the courts of the state." 28 U.S.C. § 1338 (a).  Section 1338(a)'s "arising under" language means that federal court jurisdiction is exclusive for "cases in which a well – pleaded complaint establishes . . . that the plaintiff's right to relief necessarily depends on

resolution of a substantial question of federal patent law." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808-09 (1988).

Exclusive federal jurisdiction "ensure[s] the integrity of [patent] law." *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1338 (Fed. Cir. 1998) (*overruled on other grounds by Midwest Industries, Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, (Fed. Cir. 1999)). "[T]he experience, solicitude, and hope of uniformity that a federal forum offers on federal issues" creates a strong federal interest in adjudicating patent law questions in federal court. *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).

"*Christianson* sets a lenient standard for jurisdiction under 28 U.S.C. § 1338(a)." *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1372 (Fed. Cir. 2000). As one district court held in refusing to remand:

> The policy behind *Christianson* is that the patent law is intended to be applied uniformly by the Federal Courts. If state courts were able to make rulings on any anti-competitive theory that could nullify patent rights, uniformity of the patent law would be a mirage.

*In re Tamoxifen Citrate Antitrust Litig.*, 222 F.Supp.2d 326, 333 (E.D.N.Y. 2002).

Two seminal, controlling Federal Circuit cases have established the rule under which state law malpractice claims relating to patents are subject to federal jurisdiction. In *Air Measurement Tech., Inc. v. Akin Gump Strauss Hauer & Feld*, 504 F.3d 1262, 1269 (Fed. Cir. 2007) and *Immunocept, LLC v. Fullbright & Jaworski, LLP*, 504 F.3d 1281, 1285 (Fed. Cir. 2007), the Federal Circuit found that if the court is required to determine claim scope, the case necessarily implicates substantial issues of patent law.

In *Air Measurement*, the question was whether the Plaintiff in a legal malpractice case had to establish proof of infringement in prior litigation but for defenses available to defendants that would not have been available without the attorney error. 504 F.3d at 1266-67.

6

The Court answered in the positive, as there was a "case within a case" requirement of showing proximate cause to establish malpractice. *Id.* at 1269. Thus, because, "the district court will have to adjudicate, hypothetically, the merits of the infringement claim," the Court found that the case "presents a substantial question of patent law conferring § 1338 jurisdiction." *Id.*

In the *Immunocept* case, the plaintiff alleged that an "attorney error" in drafting a claim allowed "competitors to copy the claimed method without infringing." 504 F.3d at 1284-85. Because Plaintiff would have to prove infringement by these competitors but for this drafting error, the Court held that there was § 1338 jurisdiction over the state law malpractice case. *Id.* at 1285-86. The Federal Circuit held that "there is no way Immunocept can prevail without addressing claim scope." *Id.* at 1285. "Because patent claim scope defines the scope of patent protection, we surely consider claim scope to be a substantial question of patent law." *Id.* (citation omitted). The Court in *Immunocept* explained the policy reasons claim scope determinations should only be done by a federal judge:

> Claim scope determination is a question of law that can be complex in that it may involve many claim construction doctrines. Litigants will benefit from federal judges who are used to handling these complicated rules. Additionally, Congress' intent to remove non-uniformity in the patent law, as evidenced by its enactment of the Federal Courts Improvement Act of 1982, is further indicium that § 1338 jurisdiction is proper here. *Id.* at 1285-86. (citations omitted)

**B.    Because Plaintiffs Must Prove the Amount of Damages, They Must Prove the Validity and Claim Scope of the Patent Applications**

Plaintiffs are seeking in excess of "one hundred million dollars" in consequential damages. Plaintiffs cannot merely plead that they are entitled to this amount without proof. In a patent case where patent applications were allegedly wrongfully transferred (Ex. 1 at ¶¶ 31-33) or never filed (*id.* at ¶ 37), it is necessary for Plaintiffs to prove the value of the allegedly mishandled applications. This is the basis for Plaintiffs' damages.

7

In order to determine the value of a patent application, the Court will have to, first, determine whether a valid patent would ever have issued from the applications. If the patent applications in dispute are unpatentable or so narrow in scope or inapposite as to provide no meaningful protection to the Plaintiffs, there is no injury to them. Invalid, narrow or irrelevant patent claims can certainly not be the basis for a damages claim, like here, "in excess of one hundred million dollars."

To make the determination of whether a patent application is patentable and to what scope of protection it is entitled to if it does issue, the Court must sit in the place of the United States Patent Office and evaluate the patentability of Plaintiffs' technology. The Court must determine whether these alleged inventions meet federal "novelty" and "non-obviousness" requirements, among others. 35 U.S.C.§§ 102 & 103. In order to understand the scope of the claims, one must review the claims themselves, the patent specification, the prosecution history and the prior art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005) (*en banc*). Such issues are threshold matters in deciding whether an invention is patentable and the scope of the patent. *See In re Comisky*, 499 F.3d 1365, 1371 (Fed. Cir. 2007)

Thus, the Court in the present case must determine the value of the patent applications by assessing the claim scope, validity and enforceability of the applications at issue. Absent such a finding, Plaintiff cannot prove that it was damaged by Thelen's alleged actions.

At least one post *Air Measurement* and *Immunocept* case expressly holds that the requirement of the plaintiff to prove damages is sufficient to establish federal jurisdiction under §1338(a) in a legal malpractice claim involving patent work. In *Chopra v. Townsend, Townsend & Crew LLP*, No. 07 CV 02447 (MSK/MEH), 2008 WL 413944 (D. Colo. Feb. 13, 2008), Plaintiff sued his patent counsel because counsel allowed two applications to become abandoned.

*Id.* at *1. Plaintiff argued that if his applications had issued as patents, "the competitor would have had to obtain a license from the Plaintiff." *Id.*

The *Chopra* Court relied on *Air Measurement* for the proposition that "a legal malpractice case ar[ises] under federal patent law [if] the cause of action against the attorney require[s] adjudication of the merits of an infringement claim." *Id.* at *2. The *Chopra* Court also relied on *Immunocept* for the proposition that "a legal malpractice case ar[ises] under federal patent law where the district court [is] required to determine the scope of a patent's claims." *Id.* Thus, the *Chopra* Court held that plaintiff's damages allegations were sufficient to invoke federal jurisdiction:

> Plaintiff's Complaint suggests that *in order to establish the element of damages on either of his claims against the Defendants*, the Plaintiff necessarily has to prove that his '883 Patent Application would have been successful, and that his competitor's patent application would not have been successful. *Thus, his well-pleaded Complaint arguably establishes that his right to relief depends upon resolution of a substantial question of federal patent law. Id.* at *2 (emphasis added).

Not surprisingly, Plaintiffs ignore *Chopra* and relegate *Air Measurement, Immunocept* and other controlling Federal Circuit opinions finding removal based on substantial patent law issues to a footnote. Plaintiffs' Br. at 9, n. 1. Instead, Plaintiffs rely on a series of district court cases from foreign jurisdictions that predate both *Air Measurement* and *Immunocept. Id.* at 7-9 (citing cases).

Plaintiffs rely on *Adamsu v. Gifford, Krass, Groh, Sprinkle, Anderson & Citkowski, P.C.*, 409 F.Supp.2d 788, 793 (E.D. Mich. 2005) for the proposition that "the need to consider patent issues for the purpose of determining a plaintiff's damages is *not* sufficient to confer federal jurisdiction." Plaintiffs' Br. at 10. *Adamsu* was decided 2 years prior to *Air Measurement* and *Immunocept*, and, unlike the *Chopra* court, as explained below, the *Adamsu*

court did not have the benefits of the controlling law from the Federal Circuit so important to the *Chopra* holding.

In *Adamsu*, Plaintiff sought to remand a case to state court after the defendant law firm removed to federal court. The basis for the cause of action was that the attorney committed error that resulted in a shortened life for the patent. *Id.* at 790. Plaintiff alleged this shortened patent life caused him to suffer lost royalties and licensing fees. *Id.* at 791. The law firm sought to maintain federal jurisdiction because Plaintiff's damages case required the plaintiff to show the scope of the claims and whether his competitors were infringing. *Id.* at 792. The *Adamsu* court, without the benefit of *Air Measurement* and *Immunocept*, held that "patent issues are merely incidental to [plaintiff's] malpractice claim." *Id.* The *Adamsu* ruling is in direct contravention of the later Federal Circuit law that requires that where claim scope is an issue, there is federal jurisdiction. *Air Measurement Tech.*, 504 F.3d at 1269 and *Immunocept*, 504 F.3d at 1285.

Plaintiffs also rely on *New Tek Mfg., Inc. v. Beehner*, 702 N.W.2d 336, 346 (Neb. 2005), also decided pre- *Air Measurement* and *Immunocept*, for the proposition that damages is insufficient to confer federal jurisdiction. In *New Tek*, the court noted that the question with respect to plaintiff's damages claim "is whether, absent [defendant's] negligence, New Tek would have been successful in an infringement action," an issue under *Air Measurement* that would have been sufficient to confer exclusive federal jurisdiction. More importantly, as noted by the court in *New Tek*, because the patent at issue had expired there could have been no damages. "The federal government has no interest in hypothetical determination regarding an unenforceable patent." *Id.*

**C.    In Order to Decide Causation, the Court Must Decide Inventorship and Infringement**

All of Plaintiffs' claims require Plaintiffs to prove causation. Plaintiffs' Br. at 6-7.[2] Accordingly, to prevail on any of its claims, Plaintiffs must establish that but for Thelen's allegedly improper conduct in acting as patent counsel for Plaintiffs, Plaintiffs would not have been harmed. Thus, the question for this Court is whether without Thelen's alleged wrongdoing, Gardiner would have been able to directly compete with Plaintiffs. If the answer is yes, then Thelen's actions were not the direct and proximate cause of Plaintiffs' damages.

In order to determine this question, the Court must decide two issues that depend on substantial issues of patent law. First, the Court must decide if, as a co-inventor, Gardiner had rights in the applications at issue. Inventorship is a substantial question of patent law. Second, the Court must determine whether Gardiner's actions constituted infringement of the patent applications allegedly wrongfully transferred to Gardiner. In order to do so, the Court must decide claim scope and validity, both substantial issues of patent law.

**1.    Plaintiffs' Alleged Harm Stems From Gardiner's Entry into the Market as a Competitor**

Plaintiffs allegations of harm stem directly from Gardiner's entry into the market as a competitor, which, according to Plaintiffs, was only made possible due to Thelen's actions:

> After Thelen undertook its representation of Gardiner and prepared and altered documents enabling Gardiner to obtain control of Plaintiffs' intellectual property and confidential information, Gardiner began taking other steps to launch a competing business.

---

[2] Plaintiffs rely on New York law for this proposition. The same is true under California law. *See Ambriz v. Kelegian,* 146 Cal. App. 4th 1519, 1531 (2007); *Viner v. Sweet*, 30 Cal. 4th 1232, 1242 (2003) ("In both litigation and transactional malpractice cases, the crucial causation inquiry is *what would have* happened if the defendant attorney had not been negligent.") (emphasis in original). For the purposes of responding to this motion, it is irrelevant as to which state law applies. Thelen reserves the right to argue that California and not New York law applies to the facts in this case.

To that end, during May 2006, Gardiner incorporated an entity called ID Smart, arranged for the filing of the patent applications obtained from Thelen and made arrangements to employ Saito and others that had been affiliated with e-Smart. Ex. 1 at ¶ 34.

According to Plaintiffs, "Gardiner then marketed his supposed product aggressively, contacting prospective purchasers and appearing at industry trade shows with claims he could provide a product with all of the capabilities of the e-Smart product." Ex. 1 at ¶ 35.

Plaintiffs allege harm from Gardiner's entry into the market with a competing product. Allegedly, Plaintiffs were forced to sue Gardiner to retrieve their intellectual property, were unable to deliver on existing contracts and lost revenues as a result, "struggled to develop new business and financing in the face of Gardiner's claim that he could provide an identical biometric product," and "suffered severe damage to their reputation based on the claims and conduct of Gardiner." Ex. 1 at ¶¶ 6, 49, 53, 59, and 66.

### 2.    Plaintiffs' Claims Require the Court to Determine Inventorship

As explained above, Saito, as Plaintiffs' representative, worked with Gardiner's company, A-Card, to manufacture e-Smart's product. Saito instructed Ando to file three patent applications for which Saito and Gardiner were named as co-inventors. Plaintiffs now complain that the patent applications were wrongfully handed over to Gardiner. Ex. 1 at ¶¶ 31-33, 37. Of course, the fact that he was named as a co-inventor does not necessarily mean he really was a co-inventor, which is a question of fact. However, if he truly is a co-inventor, under the law (35 U.S.C. § 262) and the terms of the Letter of Intent, Gardiner has certain rights in those applications.

Therefore, in order to determine whether Thelen's alleged actions caused the Plaintiffs harm, Plaintiffs must prove that they were entitled to ownership of the patent

12

applications to the exclusion of Gardiner. The only way they can do so is to prove that Gardiner did not invent the subject matter of the applications.

The Court of Appeals for the Federal Circuit has held that inventorship issues satisfy the jurisdictional test under *Christianson*. Inventorship is substantial issue of patent law that supports *exclusive* federal jurisdiction. *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d at 1330; *see also MCV Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568 (Fed. Cir. 1989). The Federal Circuit reaffirmed this principle in *Board of Regents v. Nippon Tel. & Tel. Corp.*, 414 F.3d 1358, 1363 (Fed. Cir. 2005) when it stated that "issues of inventorship" "present sufficiently substantial questions of federal patent law to support jurisdiction under § 1338 (a)."

The question of inventorship requires the Court to decide a number of issues of substantial patent law. The "touchstone" for determining inventorship is "conception." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997), which is "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994). The Court must weigh the evidence of conception and determine who, whether it be Saito, Gardiner or a combination, conceived of the claimed inventions in dispute.

In order to determine who is the inventor of a patent, the court must examine the scope of the patent claims and determine the person who contributed to the invention of the subject matter defined by the claims. *Frank's Casing Crew & Rental Tools, Inc. v. PMR Technologies, Ltd.*, 292 F.3d 1363, 1373 (Fed. Cir. 2002) ("When a question of inventorship is presented 'the critical question . . is who conceived . . the subject matter of the *claims* at issue.'") (citation omitted, emphasis in original). Inventorship is clearly a substantial questions of patent law.

Both Saito and Gardiner are named inventors on the applications. The Letter of Intent sets forth the parties' intent as to ownership of joint inventions:

> In the event that any A-CARD employee(s) first conceives or discovers Invention associated with manufacturing and assembling of Super Smart Cards jointly with ESMT employee(s), *title to such Invention shall vest jointly in A-Card and ESMT. Each party shall possess an undivided one-half interest in such jointly-owned Invention, as well as any corresponding patent rights and the right to make, use or sell such Invention without accounting to the other party.* Ex. 3, Letter of Intent at ¶17(c).

While the Letter of Intent was not binding on the parties, this provision regarding joint inventions is consistent with the law that each joint inventor owns an undivided joint interest in a patent.

> In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners. 35 U.S.C. § 262.

Thus, Gardiner, as a joint inventor, has rights in the applications. In order to show harm in Thelen's alleged mishandling of patent applications where Gardiner was named as a joint inventor, Plaintiffs must show he was in fact *not a joint inventor*, an issue that invokes exclusive federal jurisdiction.

### 3.    Plaintiffs' Claims Require the Court to Determine Infringement

Plaintiffs insist that they were harmed by the ability of Gardiner to enter into the market as "an aggressive and hostile competitor." Ex. 1 at ¶5. Plaintiffs allege they were harmed by Gardiner's claim that "he could provide an identical biometric product" and "suffered severe damage to their reputation based on the claims and conduct of Gardiner." Ex. 1 at ¶6. Plaintiffs' harm is a result of the fact that Gardiner "marketed his supposed product aggressively,

contacting prospective purchasers and appearing at industry trade shows with claims that he

could provide *a product with all the capabilities of the e-Smart product.*" Ex. 1 at ¶35.

        Plaintiffs' proof of causation of damages requires them to prove that Gardiner

would not have been able to do these things, but for the alleged wrongful transfer of intellectual

property by Thelen. In order to do so, it must prove that allowable and enforceable claims of the

patent applications at issue would have been infringed by Gardiner's actions. If that were true,

Plaintiffs could stop Gardiner from his activities. 35 U.S.C. § 271. As discussed above, patent

infringement, because it implicates claim scope, validity and enforceability, is a substantial issue

of patent law. *Air Measurement Tech., Inc.*, 504 F.3d at 1269; *Immunocept*, 504 F.3d at 1285.

As such, since Plaintiffs' causation proofs require that they prove infringement, this Court has

exclusive jurisdiction over the case.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion to remand this action to state court should be denied.

Dated:     September 3, 2008

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By: _____
Philip R. Forlenza
Michael J. Timmons
Diana Breaux
    Attorneys for Defendants Thelen Reid Brown
    Raysman & Steiner LLP and David B. Ritchie
1133 Avenue of the Americas
New York, New York  10036-6710
Telephone:  (212) 336-2000
prforlenza@pbwt.com

TO:     JOEL CHERNOV, ESQ.
        BRIAN DUNEFSKY, ESQ.
        Dreier LLP
        499 Park Avenue
        New York, NY  10022
        (212) 328-6130

16

# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------x

E-SMART TECHNOLOGIES INC., IVI SMART       :
TECHNOLOGIES, INC. and BIOSENSOR LLC,     :     Index No. 08601409

                Plaintiffs,           :

                              :      **COMPLAINT**

        -against-            :

THELEN REID BROWN RAYSMAN & STEINER LLP     :
(formerly THELEN REID & PRIEST LLP) and        :
DAVID B. RITCHIE,                   :

                Defendants.        :

----------------------------------------------------------------x

       Plaintiffs e-Smart Technologies, Inc. ("e-Smart"), IVI Smart Technologies, Inc.

("IVI"), and Biosensor LLC ("Biosensor" and, collectively with e-Smart and IVI, "Plaintiffs"),

by their attorneys, Dreier LLP, for their Complaint, allege as follows:

**Nature of Action**

      1.      This is a case about the deceit, divided loyalties, and gross violations of

professional standards and fiduciary duties by Thelen Reid Brown Raysman & Steiner LLP,

formerly known as Thelen Reid & Priest LLP (collectively and individually, "Thelen") and

Thelen partner David B. Ritchie ("Ritchie").

      2.      As set forth below, Thelen and Ritchie persuaded Plaintiffs to entrust all of their

critical intellectual property matters to Thelen. Once Plaintiffs did so, however, Thelen failed to

provide competent and professional representation to Plaintiffs. Instead, Thelen violated its most

fundamental ethical and fiduciary obligations by simultaneously taking on as a client Michael

Gardiner ("Gardiner") -- a manufacturing consultant and nascent competitor of Plaintiffs.

Thelen then actively assisted Gardiner in the theft of Plaintiffs' intellectual property by providing

him with access to confidential information concerning Plaintiffs' intellectual property, helping him obtain contractual opportunities that belonged to Plaintiffs, and preparing or revising documents that transferred Plaintiffs' intellectual property and contracts to Gardiner and others working with him. Incredibly, Thelen billed Plaintiffs for the legal services that benefited Gardiner.

3.    Moreover, instead of helping Plaintiffs resolve these issues, Thelen compounded its misconduct by concealing its role in enabling Gardiner's theft, providing false information to Plaintiffs, and taking positions adverse to Plaintiffs and to the advantage of Gardiner.

4.    Thelen finally acknowledged its blatant conflict of interest, but only when *Gardiner's* counsel demanded that Thelen withdraw from litigation between e-Smart and Gardiner because Thelen had represented him. Even as it withdrew, however, Thelen continued to refuse to disclose to Plaintiffs the extent of its participation in the misappropriation of their intellectual property, now citing an "attorney-client relationship" with Gardiner.

5.    As a result of Thelen's disloyal actions, Gardiner was able to use Plaintiffs' own work product, technology and confidential information to create a competing business, transforming an e-Smart subcontractor into an aggressive and hostile competitor.

6.    As a result of Thelen's wrongful conduct, Plaintiffs (i) were forced to expend enormous time and money in litigation with Gardiner in efforts to recover their intellectual property and prevent its unauthorized use; (ii) were unable to deliver on existing contracts and lost revenues as a result; (iii) struggled to develop new business and financing in the face of Gardiner's claim that he could provide an identical biometric product; (iv) suffered severe damage to their reputation based on the claims and conduct of Gardiner; and (v) together with their shareholders, lost substantial value and equity as their market capitalization fell from

greater than $200 million to less than $20 million.   In fact, as a direct result of Thelen's wrongdoing, Plaintiffs' business operations were effectively derailed for well over a year.

### The Parties

7.     Plaintiff e-Smart is a Nevada corporation with its principal place of business located at 526 West 26th Street, New York, New York.

8.     Plaintiff IVI is a Delaware corporation and the parent of e-Smart.  Since 1999, IVI and e-Smart have been engaged in the business of designing, developing, marketing and maintaining biometric identification verification systems that verify a user's identity by comparing the user's fingerprint to stored reference data.

9.     Plaintiff Biosensor is a Hawaii limited liability corporation and a wholly owned subsidiary of IVI.  Biosensor was formed to design and manufacture biometric sensors for use in products manufactured by e-Smart and/or IVI.

10.     Defendant Thelen is a limited liability partnership engaged in the practice of law with offices in New York, California, Connecticut, New Jersey, the District of Columbia and overseas.

11.     Defendant Ritchie is a partner at Thelen and was the attorney in charge of Thelen's representation of Plaintiffs in their patent and intellectual property matters.

### Background

12.     Thelen represents to the general public that it has substantial expertise in the areas of patent and intellectual property law.  Specifically, Thelen represents that (i) it "understand[s] the necessity of devising comprehensive strategies to fully develop the value of IP portfolios;" (ii) "its seasoned attorneys are uniquely positioned to provide the comprehensive services and continuity of legal care increasingly required by these business leaders;" (iii) its "attorneys provide business leaders with the counsel and direction they need to anticipate risks and grow

3

revenues in order to successfully realize the value of their IP assets;" and (iv) its "clients can benefit the most from Thelen's coordinated and comprehensive approach . . . where we can assure that their IP rights will be protected in the best way to facilitate the long term commercial development and enforcement of their IP portfolio assets." Thelen also represents that:

> Properly identifying and fully developing the commercial value within a portfolio of IP assets can seem a complex and challenging process for any business. Yet it is a vital one, since the full value of the company's investment in its IP portfolio assets may be lost if its rights are not fully protected or if management is unaware of all the value-creation options available. . . . [O]ur clients can rely on the strength of our sound counsel in all aspects of developing the value of their IP portfolios.

*See* http://www.brownraysman.com/index.cfm?section=practice&practice_id=2888) (attached hereto as Exhibit A).

13.    Based on such claims and representations regarding its expertise, Plaintiffs engaged Thelen as one of its patent counsel beginning in 2004. At all relevant times, Ritchie was the Thelen partner in charge of Plaintiffs' patent and intellectual property matters. Ritchie represented to Plaintiffs that he would oversee all of their matters and that he possessed and would apply the necessary skill and expertise to protect their intellectual property. He then billed Plaintiffs at a rate in excess of $500.00 per hour for his services.

14.    It was agreed and understood that Thelen attorneys would report directly to Plaintiffs' chief executive officer, Mary Grace, keeping her informed regarding Plaintiffs' intellectual property matters, and from 2004 until the beginning of 2006, Thelen routinely did so.

**Thelen Persuades Plaintiffs To Transfer**
**All Intellectual Property Matters To It**

15.    Prior to 2006, Plaintiffs had used various law firms for their patent and intellectual property-related legal work. In or about January 2006, Ritchie persuaded Plaintiffs to transfer to him all of their other intellectual property matters. Ritchie claimed, *inter alia*, that

4

Fulbright & Jaworski had committed errors in connection with its representation of Plaintiffs, and that he possessed superior expertise and would serve as Plaintiffs' "trusted advisor."

16.    Having been persuaded to transfer all of its intellectual property matters to Thelen, e-Smart completely relied on Thelen to advise and represent it in relation to the protection of the company's most valuable asset: its technology. Plaintiffs provided highly confidential technical information to Thelen attorneys who, in turn, were charged with the protection of that information. Thelen, however, failed to do so.

17.    For example, after convincing e-Smart to transfer its intellectual property work based on its claims that errors were committed by Fulbright, Thelen failed to undertake any comprehensive review of e-Smart's patent portfolio or history of patent preparation and prosecution, failed to evaluate the extent of its patent assignments, failed to obtain assignments of patent applications that Thelen itself prepared, and failed to advise e-Smart that its assignments were incomplete.

**Thelen Fails To Reveal Conflicts Of Interest Or Provide Adequate Counsel In Connection With Negotiations With Gardiner And A-Card**

18.    Thelen's negligence and breach of duty continued in early 2006, when Thelen purported to represent e-Smart in connection with its negotiations with Gardiner. e-Smart had entered into a tentative agreement with Gardiner pursuant to which he (and the company that he controlled, A-Card) would provide certain manufacturing services to e-Smart. Because Gardiner, in that manufacturing capacity, would obtain broad access to and physical possession of e-Smart's intellectual property and proprietary and confidential information, the protection of its intellectual property required an agreement which would prohibit the misappropriation of that technology.

5

19.    Thelen undertook to negotiate an agreement with Gardiner that would (i) prohibit Gardiner from using for his own purposes, misusing, disclosing, or in any way exploiting Plaintiffs' confidential information; and (ii) establish that e-Smart would be the rightful owner of any technology developed during the course of the manufacturing process.

20.    Thelen, however, failed to advise Plaintiffs that the conflict check conducted on Plaintiffs' new Gardiner/A-Card matter -- with Gardiner identified as the adverse party -- revealed two prior matters in which Thelen had represented Gardiner or a Gardiner entity. Upon information and belief, Thelen's own procedures required that Plaintiffs be so notified.

21.    Thelen then assigned the very same attorney who had the prior relationship with Gardiner -- an associate with less than three years of legal experience -- to negotiate and draft the agreement with Gardiner on behalf of e-Smart. Further, upon information and belief, Ritchie failed to supervise this associate. Plaintiffs ultimately consented to the terms of the agreement that Thelen drafted (the "Gardiner/A-Card Agreement") based on their belief that Thelen had applied its expertise and was acting competently and without conflict of interest.

22.    In fact, Thelen had not acted competently. The agreement failed to provide Plaintiffs with any meaningful protection for its existing proprietary information. Nor did it ensure that e-Smart would be the owner of any proprietary information developed in the manufacturing process. Most importantly, the agreement failed to provide any significant limits on Gardiner's ability to launch a competing business using e-Smart's own technology. As a result, Gardiner was able to use e-Smart's years of research and development and its confidential and proprietary information to launch his competing business.

6

**Thelen Improperly Represents Gardiner**
**While Simultaneously Representing Plaintiffs**

23.    Upon information and belief, by March 2006, Thelen was aware of Gardiner's efforts to misappropriate Plaintiffs' proprietary information.    Upon information and belief, Thelen also learned that Gardiner had induced Plaintiffs' lead inventor, Tamio Saito ("Saito") (who served as both an officer and director of Plaintiffs and was subject to both nondisclosure and noncompetition agreements with Plaintiffs) as well as other e-Smart engineers to assist him in these wrongful efforts to divert Plaintiffs' technology to Gardiner.

24.    Notwithstanding this knowledge, Thelen proceeded to provide legal services and assistance to Gardiner to the detriment of Plaintiffs.    Beginning in or around March 2006 and unbeknownst to Plaintiffs, Thelen entered into a separate attorney-client relationship with Gardiner and/or Saito.    In connection therewith, Thelen failed to perform a conflict check and obtained a retainer check from Gardiner, but concealed it by hiding it in a desk drawer.    Of course, any such conflict check would have disclosed that Gardiner was adverse to Plaintiffs. Next, in order to hide the work that it then was performing for Gardiner, Thelen failed to open any new matters or create new entries in its filing system in accordance with its normal procedure, instead keeping the work performed for Gardiner in files in the associate's office. Thelen also altered its practice of reporting to Plaintiffs' management.    To add insult to injury, Thelen then billed Plaintiffs for some or all of the services it performed for Gardiner.

**Thelen Improperly Diverts The Arakawa Patent To Gardiner**

25.    Before beginning its formal representation of Gardiner, Thelen had negotiated the assignment to Plaintiffs of a patent application relating to data encryption (the "Arakawa Patent").    All related documents, including the assignment from the inventor, were obtained, prepared, and filed by Thelen in February 2006.    In or about May of 2006, however, at the

7

direction of Gardiner and/or Saito, Thelen prepared a subsequent assignment of the Arakawa

Patent transferring it to Aten -- a company owned and controlled by Gardiner. Thelen forwarded

this new assignment to the inventor and obtained his signature.

26.     At no time did Thelen advise Plaintiffs' management that it was facilitating the

transfer of the patent application from Plaintiffs to a Gardiner-controlled company. Instead, as

noted above, it changed its reporting procedures, and excluded Plaintiffs' management from the

communications regarding the "reassignment" of the Arakawa Patent.

27.     Ultimately, in June 2006, Ritchie acknowledged that the purported

"reassignment" of the Arakawa patent was improper. In a letter to Saito dated July 12, 2006,

Ritchie admitted that the purported reassignment was "not proper" given "your status with IVI

Smart Technologies." Ritchie then added that the firm could not represent "Aten," the purported

assignee, "without permission in writing from another officer of IVI . . ." and that Saito should

seek "independent legal counsel" in respect to the reassignment issue.

**Thelen Improperly Transfers Plaintiffs' Contract**
**With John Hopkins University To Gardiner**

28.     Beginning around November 2005, Thelen negotiated a research agreement

between Johns Hopkins University ("JHU") and Plaintiffs' subsidiary, Biosensor, relating to the

development and testing of a particular biometric sensor. The project involved detailed design

and configuration information developed by Saito for Plaintiffs, and was the subject of extensive

discussions between Thelen and Saito, and extensive negotiations between Thelen and JHU's

counsel.

29.     Discussions relating to the JHU-Biosensor agreement continued in 2006 and, in or

about April 2006, a revised draft of the agreement was circulated. The draft agreement

8

contained confidential information developed by and for Plaintiffs, and Thelen billed all work relating to the negotiation of the agreement to Plaintiffs

30.     Notwithstanding, on or about May 17, 2006, however, Thelen changed the name of the contracting party in the draft agreement from Biosensor to a Gardiner-controlled entity called Polymerbio.

**Thelen Improperly Transfers Additional
e-Smart Patent Applications To Gardiner**

31.     On or about May 1, 2006, Thelen was preparing or had completed preparation of certain new patent applications for Plaintiffs based on information received from Saito and Plaintiffs' other engineers. But, instead of filing the patent applications with appropriate assignments to Plaintiffs, Thelen handed over the physical applications to Gardiner or others acting in concert with him. Thelen failed to advise Plaintiffs that it had provided these patent applications to Gardiner and those acting with him. Thelen did, however, bill Plaintiffs for its legal work relating to the development of those applications.

32.     As a result of Thelen's actions, Gardiner was able to cause the applications to be filed for the benefit of entities under his control, and has since claimed ownership of the inventions described therein.

33.     Based on these actions, and as a direct result of Thelen's failure to perform any due diligence at the time it convinced e-Smart to rely exclusively on Thelen, Plaintiffs have been unable and/or significantly hampered in their ability to obtain the patent assignments to which they are entitled.

9

**Gardiner Threatens To Enter The Biometric**
**Business Unless Plaintiffs Meet His Demands**

34.    After Thelen undertook its representation of Gardiner and prepared and altered documents enabling Gardiner to obtain control of Plaintiffs' intellectual property and confidential information, Gardiner began taking other steps to launch a competing business. To that end, during May 2006, Gardiner incorporated an entity called ID Smart, arranged for the filing of the patent applications obtained from Thelen, and made arrangements to employ Saito and others that had been affiliated with e-Smart.

35.    In June 2006, Gardiner announced to e-Smart that he had his "own IP," had hired all of the e-Smart research and engineering staff, intended to produce a competing biometric product, and would manufacture for e-Smart only if his terms were met. Gardiner then marketed his supposed product aggressively, contacting prospective purchasers and appearing at industry trade shows with claims that he could provide a product with all of the capabilities of the e-Smart product.

**Thelen's Concealment And Continued Improper Conduct**

36.    During the period June through August 2006, e-Smart turned to Thelen to represent it in connection with its developing dispute with Gardiner and Saito. Ritchie himself purported to be taking steps to assist e-Smart in this regard, including arranging a meeting between all participants. Tellingly, the Thelen associate who had worked on both e-Smart's and Gardiner's matters told Ritchie that she was "uncomfortable" having a meeting to resolve the dispute, because she had been preparing patent applications for Gardiner and the entities he controlled.

37.    During this same period, Thelen concealed its actions on behalf of Gardiner. While Ritchie informed Plaintiffs of certain of Saito's efforts to transfer e-Smart's intellectual

10

property, he failed to disclose that it was Thelen that had prepared and provided Gardiner with the assignment of the Arakawa Patent. He also failed to disclose, *inter alia*, that:

- e-Smart's biometric sensor project had been diverted to Gardiner;

- e-Smart's patents applications had been delivered to Gardiner and/or Saito;

- Thelen failed to prepare or file for e-Smart applications relating to the inventions by Saito and other e-Smart employees and consultants and incorporated in patent applications delivered to Saito and/or Gardiner; and

- Saito and Gardiner had filed patent applications obtained from e-Smart on behalf of Gardiner and entities that he controlled.

38.    In addition, Thelen also falsely stated to Plaintiffs that patent applications had not been filed by Gardiner or Saito, because, according to Thelen, it had convinced Saito that it would violate his fiduciary duties as an officer and director of Plaintiffs.

39.    Although Thelen failed to disclose to Plaintiffs the extent to which it was facilitating Gardiner's misappropriation of Plaintiffs' information and technology, it did insist on payment of all of its outstanding invoices and even sought an additional payment for the future legal services that would have to be rendered to address Gardiner's misappropriation of Plaintiffs' technology. Plaintiffs made those payments, forwarding $200,000 in June to cover outstanding invoices of $150,000 and an additional $50,000 for work to be performed concerning Gardiner.

**Ritchie Persuades Plaintiffs To Let Thelen Handle**
**Litigation That Related To His Own Firm's Conduct**

40.    In September 2006, e-Smart and IVI sued Gardiner and others in the United States District Court for the Northern District of California to recover Plaintiffs' misappropriated property and to prevent its unauthorized use. Before filing that action, Plaintiffs' litigation counsel provided a copy of the complaint to Thelen for its review.

11

41.    Thelen attorneys confirmed the accuracy of the contents of the complaint against Gardiner, but did not disclose to Plaintiffs their knowledge of Gardiner's misappropriation of Plaintiffs' technology and/or their own participation in Gardiner's activities.

42.    Instead of informing Plaintiffs of the transfers of technology which it had facilitated, Thelen sought to conceal its culpability by taking control of the litigation and becoming "coordinating counsel." In fact, Ritchie persuaded Plaintiffs to retain Thelen as their lead counsel in the action against Gardiner, which they did in December 2006.

43.    After Thelen had filed its Notice of Appearance in the Gardiner litigation, Gardiner's counsel sent a letter to Thelen demanding that it withdraw, because of a conflict of interest arising from Thelen's concurrent representation of Gardiner. On January 31, 2007, Thelen withdrew as counsel for Plaintiffs.

44.    At or about the time of Thelen's withdrawal, Plaintiffs asked Thelen to explain its past services for Gardiner. Thelen refused to do so, stating that it had an attorney-client relationship with Gardiner.

45.    Thelen subsequently billed e-Smart more than $100,000 for the firm's work in connection with the Gardiner litigation.

46.    In addition, IVI has become embroiled in litigation commenced by Gardiner against it in the United States District Court for the Southern District of California, costing the company thousands of dollars in legal fees and expenses to date.

**Ritchie's Failures To Adequately Represent Plaintiffs**

47.    Throughout the entire period at issue, Ritchie was the partner in charge of Plaintiffs' patent matters and Plaintiffs relied on Ritchie to represent them diligently and competently. During the period January 2006 through January 2007, Ritchie failed to provide Plaintiffs with proper representation. To the contrary, he knowingly participated in actions that

facilitated Gardiner's misappropriation of Plaintiffs' proprietary technology, and failed to perform, conduct, oversee, review or adequately supervise other Thelen attorneys assigned to Plaintiffs' matters.

48.    In addition, during the period January 2006 through January 2007, Ritchie failed to represent Plaintiffs competently because he had knew or should have known that Saito was engaging in acts adverse to Plaintiffs, that Gardiner was attempting to obtain access to and control of Plaintiffs' technology, and that Thelen attorneys were engaged in conduct adverse to the interests of Plaintiffs, but took no steps to rectify such circumstances.

49.    As a direct and proximate result of Thelen and Ritchie's wrongful conduct, (i) Plaintiffs incurred substantial legal fees and costs, (ii) their proprietary technology was stolen, (iii) business opportunities were lost, (iv) production and delivery of their product was substantially delayed, (v) their receipt of income from their products was substantially and adversely affected, and (vi) they had to incur substantial costs to initiate and prosecute litigation to recover their stolen technology and prevent its misuse by Gardiner and others.

### First Cause of Action
### (Breach of Fiduciary Duty)

50.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 49 as though fully set forth herein.

51.    At all relevant times, defendants had an attorney-client relationship with Plaintiffs. As a result, defendants owed Plaintiffs a duty to exercise due care and diligence to preserve and protect the confidential information received from Plaintiffs. Defendants also owed to Plaintiffs, among other things, duties of loyalty, good faith, trust, candor, and due care, which required them to avoid representing other clients with differing interests from Plaintiffs; to refrain from affirmatively assisting a third-party in taking a position detrimental and adverse to

Plaintiffs; and to refrain from disclosing confidences obtained from Plaintiffs. In addition, as fiduciaries, defendants had a duty to avoid acting in a manner detrimental to the business and property rights of Plaintiffs, including a duty to refrain from making knowing misrepresentations to Plaintiffs, from concealing information from Plaintiffs, and from making statements to Plaintiffs in reckless disregard for their truth and accuracy.

52.    By making misrepresentations to Plaintiffs, by concealing material information, by making statements in reckless disregard of their truth or accuracy, by disclosing Plaintiffs' confidential information to Gardiner, by concealing its adverse representation of Gardiner, and by assisting others to pursue objectives that directly conflicted with Plaintiffs' interests, defendants breached the obligations that they owed to Plaintiffs.

53.    These breaches of duty directly and proximately caused Plaintiffs to experience substantial delays in production of their product and their receipt of revenues, caused Plaintiffs to incur substantial expenses to address the misconduct of Gardiner and others, including the misconduct facilitated by defendants, and caused injury to the reputation and business relationships of Plaintiffs.

54.    As a result of defendant's breaches of their fiduciary obligations to Plaintiffs, (i) Thelen has forfeited any and all right to compensation for its services to Plaintiffs during the time period relevant to these claims and should disgorge all fees it has received from Plaintiffs; (ii) defendants are liable for the costs that Plaintiffs have incurred in litigations with Gardiner; and (iii) defendants are liable to Plaintiffs for consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars, plus compensatory and punitive damages.

14

## Second Cause of Action
## (Legal Malpractice)

55.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 49 as though fully set forth herein.

56.    By virtue of defendants' attorney-client relationship with Plaintiffs, defendants owed Plaintiffs a duty to exercise due care and diligence by taking reasonable steps to preserve and protect of the confidential information received from Plaintiffs.  Defendants also owed to Plaintiffs, among other things, duties of loyalty, good faith, trust, candor, and due care.  In particular, defendants had a duty to refrain from representing a client whose interests were adverse to Plaintiffs, to avoid and prevent the disclosure and misuse of Plaintiffs' confidential information, to refrain from accepting or engaging in any representation of another client which would interfere with its professional judgments or obligations and relationship to its existing clients, to refrain from assisting a third-party take a position detrimental and adverse to Plaintiffs, and from disclosing confidences obtained from Plaintiffs.

57.    Defendants held themselves out to Plaintiffs as possessing expertise in matters relating to intellectual property, and as being skilled and competent attorneys adhering to professional standards.

58.    Defendants failed to act with the requisite level of skill and competence in their representation of Plaintiffs and breached their duties to Plaintiffs by unreasonably acting in a manner detrimental to the business and property rights of Plaintiffs; by negligently, recklessly, or intentionally disclosing Plaintiffs' confidential information to Gardiner, by making knowing misrepresentations to Plaintiffs; by concealing material information from Plaintiffs that Plaintiffs had a right to learn; by making statements concerning Plaintiffs in reckless disregard for the truth

15

or accuracy of such statements; and by assisting third-parties to engage in actions adverse to Plaintiffs.

59.    Defendants' breaches of duty and failure to act with the requisite level of skill and competence in their representation of Plaintiffs directly and proximately caused Plaintiffs to experience substantial delays in production of their product and their receipt of revenues, caused Plaintiffs to incur substantial expenses in legal actions to address the conduct of Gardiner and others, including the misconduct facilitated by defendants, and caused injury to the reputation and business relationships of Plaintiffs.

60.    As a result of defendants' legal malpractice, (i) Thelen has forfeited any and all right to compensation for its services to Plaintiffs during the time period relevant to these claims and should disgorge all fees it has received from Plaintiffs; (ii) defendants are liable for the costs that Plaintiffs have incurred in litigations with Gardiner; and (iii) defendants are liable to Plaintiffs for consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars, plus compensatory and punitive damages.

### Third Cause of Action
### (Breach of Contract)

61.    Plaintiffs repeat and allege the allegations set forth in paragraphs 1 through 49 as thought fully set for the herein.

62.    Plaintiffs and Thelen entered into a contract creating an attorney-client relationship between them. Pursuant to its contract with Plaintiffs, Thelen had an obligation to refrain from accepting representation of a client with interests adverse to Plaintiffs without at least asking for Plaintiffs' consent, to avoid and prevent disclosure and misuse of Plaintiffs' confidential information, to refrain from accepting or engaging in any representation of another client which would interfere with its professional judgments or obligations and relationship to

16

Plaintiffs, to refrain from assisting a third party take positions detrimental and adverse to Plaintiffs, and from disclosing confidences obtained from Plaintiffs.

63.     Thelen violated its contractual obligations to Plaintiffs by failing to act with the requisite level of skill and competence in its representation of Plaintiffs, by breaching its duties to Plaintiffs, by acting in a manner detrimental to the business and property rights of Plaintiffs, by disclosing Plaintiffs' confidential information to Gardiner, by making knowing misrepresentations to Plaintiffs, by concealing information from Plaintiffs, by making statements in reckless disregard for the truth and accuracy or such statement concerning Plaintiffs, and by assisting third parties in actions adverse to the interests of Plaintiffs.

64.     Plaintiffs have fully performed their obligations under their agreement with Thelen.

65.     Thelen's conduct as described herein constitutes a material breach of its contractual obligations to Plaintiffs.

66.     As a direct, foreseeable and proximate result of Thelen's breaches of its contractual obligations, its breaches of duty, and its failure to act with the requisite level of skill and competence in its representation of Plaintiffs, Plaintiffs experienced substantial delays in production of their product and their receipt of revenues; Plaintiffs incurred substantial expenses addressing the misconduct of Gardiner and others, including the misconduct facilitated by Thelen; and the reputation and business relationships of Plaintiffs were injured.

67.     As a result of Thelen's conduct, Thelen is liable to Plaintiffs for consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars, plus compensatory damages.

### Fourth Cause of Action
### (Aiding & Abetting Breaches of Fiduciary Duty and Contract)

68.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 49 as though fully set forth herein.

69.    Defendants, at all relevant times, had an attorney-client relationship with Plaintiffs.  As a result, defendants dealt directly with Plaintiffs' lead inventor, Saito, and with other engineers working on behalf of Plaintiffs.

70.    Defendants were aware that Saito served as both an officer and director of Plaintiffs, that he possessed fiduciary duties attendant to those relationships, and that he was subject to both nondisclosure and noncompetition agreements with Plaintiffs.

71.    Defendants were aware that Plaintiffs had expended substantial efforts and resources to protect their confidential information and intellectual property.  Plaintiffs had instructed defendants to take appropriate steps to protect their confidential information and intellectual property.

72.    Starting in no later than March 2006, defendants had knowledge and information that Saito was engaging in conduct that violated his contractual and fiduciary obligations to Plaintiffs.

73.    Defendants acted in breach of their obligations, and facilitated and assisted the misconduct of Saito, by failing to protect the business and property rights of Plaintiffs, by assisting and cooperating with Saito in actions that contravened his duties to Plaintiffs, and by failing to advise Plaintiffs of the actions taken by Saito in contravention of his contractual and fiduciary obligations to Plaintiffs.

74.    By virtue of the acts alleged herein, defendants knowingly participated and substantially assisted in Saito's breach of fiduciary and contractual duties owed to Plaintiffs.

18

75.    Defendants' aiding and abetting of Saito's breaches of fiduciary and contractual obligations caused damages to Plaintiffs in an amount to be proven at trial, but which are believed to be in excess of one hundred million dollars, plus compensatory and punitive damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against defendants as follows:

A.    On the First Cause of Action against defendants, (i) declaring that defendants have forfeited any and all right to compensation for its services to Plaintiffs during the time period relevant to these claims; (ii) directing that Thelen disgorge all fees it has received from Plaintiffs; (iii) awarding Plaintiffs the costs and expenses that they have incurred in litigations that have resulted as a result of Defendants' conduct; (iv) awarding Plaintiffs consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars; and (v) awarding compensatory and punitive damages.

B.    On the Second Cause of Action against defendants, (i) declaring that defendants have forfeited any and all right to compensation for its services to Plaintiffs during the time period relevant to these claims; (ii) directing that Thelen disgorge all fees received from Plaintiffs; (iii) awarding Plaintiffs the costs and expenses that they have incurred in litigations that have resulted as a result of defendants' conduct; (iv) awarding Plaintiffs consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars; and (v) awarding compensatory and punitive damages.

C.    On the Third Cause of Action against Thelen, (i) awarding Plaintiffs the costs and expenses that they have incurred in litigations that have resulted as a result of Thelen's conduct;

19

(ii) awarding Plaintiffs consequential damages in an amount to be proven at trial but believed to be in excess of one hundred million dollars; and (iii) awarding compensatory damages.

D.    On the Fourth Cause of Action against defendants, (i) awarding Plaintiffs the costs and expenses that they have incurred in litigations that have resulted as a result of defendants' conduct; (ii) awarding Plaintiffs consequential damages in an amount to be proven at trial, but believed to be in excess of one hundred million dollars; and (iii) awarding compensatory and punitive damages.

E.    Awarding Plaintiffs their costs, attorneys' fees, prejudgment interest and such other and additional relief as the Court deems just and proper.

Dated: New York, New York
       June 10, 2008

                                    DREIER LLP

                                    By: _____
                                        Joel Chernov
                                        Brian Dunefsky
                                    499 Park Avenue
                                    New York, New York, 10022
                                    (212) 328-6100

                                    *Attorneys for Plaintiffs*
                                    *e-Smart Technologies, Inc., IVI Smart*
                                    *Technologies, Inc. and Biosensor LLC*

# EXHIBIT A

Thelen Reid Brown Raysman & Steiner LLP, an International Law Firm

English | Chinese

# Thelen Reid Brown Raysman & Steiner LLP
## Intellectual Property

Businesses involved in commercially developing their own intellectual property (IP) portfolio assets, and those relying on the use of IP assets owned by others, face many risks arising from the growing variety and complexity of IP assets, increasing global competition, and diversity in protections afforded IP rights in foreign markets.

In today's environment, businesses must assert greater control over those risks. The IP attorneys of Thelen Reid Brown Raysman & Steiner LLP understand the necessity of devising comprehensive strategies to fully develop the value of IP portfolios across asset classes and geographic markets, and of assuring the contract rights of our clients whose businesses depend on the permitted commercial development of another party's IP.

Thelen's seasoned attorneys are uniquely positioned to provide the comprehensive services and continuity of legal care increasingly required by these business leaders. Our IP attorneys collaboratively apply their respective experience in the areas of patents, trademarks, copyrights, trade secrets, and competition law.

Our clients benefit from our ability to offer both the focused experience of a boutique and the extensive multi-disciplinary resources of a full-service national firm. Thelen's attorneys provide business leaders with the counsel and direction they need to anticipate risks and grow revenues in order to successfully realize the value of their IP assets.

With experienced IP attorneys strategically located in major centers of commercial activity nationwide, we provide our clients with cost-effective legal service through seamless coordination between our offices coast-to-coast. Our IP attorneys are backed by the full multi-disciplinary resources of the firm, and can confidently handle any type of IP-related matter, in any jurisdiction, and at any stage in the growth and development of our clients' IP assets.

### Acquiring and Protecting IP Rights
The acquisition and protection of IP rights represents the initial-and perhaps most critical-stage in developing the full value of any company's portfolio of IP assets. It is at this stage that our clients can benefit the most from Thelen's coordinated and comprehensive approach, and where we can assure that their IP rights will be protected in the best way to facilitate the long-term commercial development and enforcement of their IP portfolio assets.

Using our collective experience in a team approach, Thelen provides forward-looking strategic counsel to clients across many industries regarding the types of protection available for a given technology or creative work. Where appropriate, we evaluate the benefits, costs, time considerations, and consequences of pursuing various combinations of protection that will best fit our clients' business objectives. Thelen's nationwide network of offices are seamlessly coordinated to provide integration of practice capabilities and achieve cost-effective services for our clients.

### Managing and Developing the Value of IP Rights and Assets
Properly identifying and fully developing the commercial value held within a portfolio of IP assets can seem a complex and challenging process for any business. Yet, it is a vital one, since the full value of a company's investment in its IP portfolio assets may be lost if its rights are not fully protected or if management is unaware of all the value-creation options available. A company's effectiveness in meeting these challenges reflects directly on its management, and failure can place the company at a competitive disadvantage.

Thelen's attorneys help our clients face these challenges by obtaining broad protection of their IP rights in ways that anticipate and facilitate the commercial development of those assets for maximum return, and provide our clients with the counseling and transactional services they need to manage and develop the value of their IP portfolio assets across the different classes of protection and in the various forms of economic activity in which they may appear.

We have found that an effective strategy often includes conducting comprehensive value audits of client IP portfolios, which can

**Exhibit 2**

Philip R. Forlenza
Michael J. Timmons
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336-2000
Fax: 212-336-2222
Email:  mjtimmons@pbwt.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                                                    :
E-SMART TECHNOLOGIES INC., IVI SMART                                :
TECHNOLOGIES, INC. and BIOSENSOR LLC,                               : 08 Civ. 5379 (NRB) (DFE)
                                                                    :
                    Plaintiffs,                                     :
                                                                    : **ANSWER &**
           -against-                                                : **COUNTERCLAIMS**
                                                                    :
THELEN REID BROWN RAYSMAN & STEINER LLP                             :
and DAVID B. RITCHIE,                                               :
                                                                    :
                    Defendants.                                     :
                                                                    :
------------------------------------------------------------------ X


## DEFENDANTS' ANSWER AND COUNTERCLAIMS

   Defendants Thelen Reid Brown Raysman & Steiner LLP ("Thelen") and David B.

Ritchie ("Ritchie"), by their attorneys, Patterson Belknap Webb & Tyler LLP, for their answer to

the claims asserted in the Complaint of Plaintiffs e-Smart Technologies Inc. ("e-Smart"), IVI

Smart Technologies, Inc. ("IVI Smart") and Biosensor LLC ("Biosensor") (collectively,

"Plaintiffs") respond as follows:

1.    Defendants admit that Thelen Reid Brown Raysman & Steiner LLP ("Thelen") was formerly known as Thelen Reid & Priest LLP, and that David B. Ritchie ("Ritchie") is a partner of Thelen. Defendants deny the remainder of the allegations contained in paragraph 1.

2.    Defendants deny the allegations contained in paragraph 2.

3.    Defendants deny the allegations contained in paragraph 3.

4.    Defendants admit that Thelen represented e-Smart and IVI Smart in the *e-Smart et al. v. Drizin et al.* action pending in the United States District Court for the Northern District of California, No. 06-5528, from December 2006 to January 2007 and that Thelen no longer represents any plaintiff in connection with that litigation. Defendants deny the remainder of the allegations contained in paragraph 4.

5.    Defendants deny the allegations contained in paragraph 5.

6.    Defendants deny the allegations contained in paragraph 6.

7.    Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph 7.

8.    Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph 8.

9.    Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph 9.

10.    Defendants admit the allegations contained in paragraph 10.

11.    Defendants admit that Ritchie is a partner at Thelen and that he was the Client Manager for Thelen's representation of Plaintiffs. Defendants deny the remainder of the allegations contained in paragraph 11.

2

12.     Defendants admit that Plaintiffs have accurately quoted from portions of Thelen's website as it appeared on June 10, 2008 in paragraph 12.  Defendants deny the remaining allegations contained in paragraph 12.

13.     Defendants admit that starting in January 2004, Plaintiff Biosensor engaged Thelen, in April 2004, Plaintiff e-Smart engaged Thelen and in August 2006, Plaintiff IVI Smart engaged Thelen.  Defendants further admit that Ritchie was the Client Manager for Thelen's work for Plaintiffs, and that Plaintiffs were billed for the legal services that Thelen provided to Plaintiffs in accordance with Thelen's billing and payment policies.  Defendants deny the remainder of the allegations contained in paragraph 13.

14.     Defendants deny the allegations contained in paragraph 14.

15.     Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in the first sentence of paragraph 15.  Defendants deny the remainder of the allegations contained in paragraph 15.

16.     Defendants deny the allegations contained in paragraph 16, except that Defendants admit that during the course of Thelen's representation of Plaintiffs, Thelen attorneys had privileged communications with Plaintiffs' representatives during which some confidential information was shared by Plaintiffs with Thelen attorneys.

17.     Defendants deny the allegations contained in paragraph 17.

18.     Defendants admit that Thelen provided legal services to e-Smart in early 2006 in connection with a so-called "letter of intent" referenced in paragraph 18.  Defendants neither admit nor deny the legal conclusions alleged in paragraph 18, and otherwise deny the remainder of the allegations contained in paragraph 18.

19.     Defendants deny the allegations contained in paragraph 19.

3

20.    Defendants deny the allegations contained in paragraph 20.

21.    Defendants deny knowledge or information sufficient to form a belief regarding the third sentence contained in paragraph 21. Defendants deny the remainder of the allegations contained in paragraph 21.

22.    Defendants deny the allegations contained in paragraph 22.

23.    Defendants deny the allegations contained in paragraph 23.

24.    Defendants deny the allegations contained in paragraph 24.

25.    Defendants admit that a patent assignment was drafted by a Thelen associate in February 2006 at Saito's direction that assigned a PCT patent application from Arakawa to IVI Smart. Defendants further admit that in May 2006, at the direction of Saito, the same Thelen associate prepared another assignment of the PCT application from Arakawa to ATEN. Defendants deny the remainder of the allegations contained in paragraph 25.

26.    Defendants deny the allegations contained in paragraph 26.

27.    Defendants admit that on or around July 12, 2006, Ritchie drafted a letter addressed to Saito, but which Ritchie never sent to Saito. Defendants further admit that Plaintiffs have accurately quoted from certain portions of the draft letter, but that the draft letter does not mention a "reassignment" or the phrase "not proper" as Plaintiffs have alleged in paragraph 27. Defendants deny the remainder of the allegations contained in paragraph 27.

28.    Defendants admit that Thelen provided Biosensor with legal services in connection an agreement with Johns Hopkins University. Defendants deny the remainder of the allegations contained in paragraph 28.

29.    Defendants admit that in or about April 2006, a revised draft of the agreement referenced in paragraph 29 was circulated. Defendants deny knowledge or information sufficient

4

to form a belief regarding whether the draft agreement contained confidential information developed by and for Plaintiffs.  Defendants deny the remainder of the allegations contained in paragraph 29.

30.    Thelen admits that on or about May 17, 2006, pursuant to instructions from e-Smart, a company called Polymerbio replaced Biosensor as the party to the agreement with Johns Hopkins University.  Defendants deny the remainder of the allegations contained in paragraph 30.

31.    Defendants admit that on May 1, 2006, Saito requested that Thelen work on a new patent application.  Defendants deny the remainder of the allegations contained in paragraph 31.

32.    Defendants deny the allegations contained in paragraph 32, except that Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding Gardiner.

33.    Defendants deny the allegations contained in paragraph 33.

34.    Defendants deny the allegations contained in paragraph 34, except that Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding Gardiner.

35.    Defendants deny the allegations contained in paragraph 35, except that Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding Gardiner.

36.    Defendants deny the allegations contained in paragraph 36 on the grounds that they are vague and ambiguous, except that to the extent the allegations refer to a June 20, 2006 e-mail from Masako Ando to Ritchie, Defendants refer to that e-mail, which speaks for itself.

37.    Defendants deny the allegations contained in paragraph 37.

5

38.     Defendants deny the allegations contained in paragraph 38.

39.     Defendants deny the allegations contained in paragraph 39, except that Defendants admit they sought payment for various legal services and disbursements that Thelen performed or advanced on behalf of Biosensor, e-Smart and IVI Smart.  Defendants further admits that on or around June 19, 2006 e-Smart wired $200,000 to Thelen.

40.     Defendants admit the allegations contained in paragraph 40 to the extent that e-Smart and IVI Smart sued Gardiner and others in the United States District Court for the Northern District of California and that a draft complaint was sent to Ritchie.  Defendants deny the remainder of the allegations contained in paragraph 40.

41.     Defendants deny the allegations contained in paragraph 41.

42.     Defendants deny the allegations contained in paragraph 42.

43.     Defendants admit that they received a letter from Gardiner's counsel.  Defendants admit that Thelen withdrew as counsel for e-Smart and IVI Smart on or about January 31, 2007 and denies the remainder of the allegations contained in paragraph 43.

44.     Defendants deny the allegations set forth in paragraph 44.

45.     Defendants deny the allegations set forth in paragraph 45, and further aver that any invoices Thelen prepared and sent in connection with the Gardiner litigation were sent to IVI Smart.

46.     Defendants deny Defendants deny the allegations set forth in paragraph 46.

47.     Defendants deny the allegations contained in paragraph 47, except that Defendants admit that Ritchie was the Client Manager for the legal services Thelen performed on behalf of Plaintiffs.

48.     Defendants deny the allegations contained in paragraph 48.

6

49.    Defendants deny the allegations contained in paragraph 49.

## FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty

50.    With respect to the allegations contained in paragraph 50, Defendants repeat and reallege the responses to paragraphs 1 through 49 as if fully set forth herein.

51.    Defendants neither admit nor deny the legal conclusions contained in paragraph 51, except that Thelen admits that it entered into a series of agreements with the various Plaintiffs that established an attorney-client relationship with that particular Plaintiff, *i.e.*, starting in January 2004, Plaintiff Biosensor engaged Thelen, in April 2004, Plaintiff e-Smart engaged Thelen and in August 2006, Plaintiff IVI Smart engaged Thelen.  To the extent any further response is required, Defendants deny the allegations contained in paragraph 51.

52.    Defendants neither admit nor deny the legal conclusions contained in paragraph 52.  To the extent a response is required, Defendants deny the allegations contained in paragraph 52.

53.    Defendants neither admit nor deny the legal conclusions contained in paragraph 53.  To the extent a response is required, Defendants deny the allegations contained in paragraph 53.

54.    Defendants neither admit nor deny the legal conclusions contained in paragraph 54.  To the extent a response is required, Defendants deny the allegations contained in paragraph 54.

## SECOND CAUSE OF ACTION
### Legal Malpractice

55.    With respect to the allegations contained in paragraph 55, Defendants repeat and reallege the responses to paragraphs 1 through 49 as if fully set forth herein.

7

56.    Defendants neither admit nor deny the legal conclusions contained in paragraph 56. To the extent a response is required, Defendants deny the allegations contained in paragraph 56.

57.    Defendants neither admit nor deny the legal conclusions contained in paragraph 57. To the extent a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning what Thelen employees may have told Plaintiffs.

58.    Defendants neither admit nor deny the legal conclusions contained in paragraph 58. To the extent a response is required, Defendants deny the allegations contained in paragraph 58.

59.    Defendants neither admit nor deny the legal conclusions contained in paragraph 59. To the extent a response is required, Defendants deny the allegations contained in paragraph 59.

60.    Defendants neither admit nor deny the legal conclusions contained in paragraph 60. To the extent a response is required, Defendants deny the allegations contained in paragraph 60.

## THIRD CAUSE OF ACTION
### Breach of Contract

61.    With respect to the allegations contained in paragraph 61, Defendants repeat and reallege the responses to paragraphs 1 through 49 as if fully set forth herein.

62.    Defendants neither admit nor deny the legal conclusions contained in paragraph 62. To the extent a response is required, Defendants admit that Plaintiffs and Thelen entered into a series of contracts, at different times creating an attorney-client relationship between Plaintiffs and Thelen, and deny the remainder of the allegations contained in paragraph 62.

8

63.     Defendants neither admit nor deny the legal conclusions contained in paragraph 63. To the extent a response is required, Defendants deny the allegations contained in paragraph 63.

64.     Defendants neither admit nor deny the legal conclusions contained in paragraph 64. To the extent a response is required, Defendants deny the allegations contained in paragraph 64.

65.     Defendants neither admit nor deny the legal conclusions contained in paragraph 65. To the extent a response is required, Defendants deny the allegations contained in paragraph 65.

66.     Defendants neither admit nor deny the legal conclusions contained in paragraph 66. To the extent a response is required, Defendants deny the allegations contained in paragraph 66.

67.     Defendants neither admit nor deny the legal conclusions contained in paragraph 67. To the extent a response is required, Defendants deny the allegations contained in paragraph 67.

## FOURTH CAUSE OF ACTION
### Aiding & Abetting Breaches of Fiduciary Duty and Contract

68.     With respect to the allegations contained in paragraph 68, Defendants repeat and reallege the responses to paragraphs 1 through 49 as if fully set forth herein.

69.     Thelen admits that it entered into a series of agreements with the various Plaintiffs that established an attorney-client relationship with that particular Plaintiff, *i.e.*, starting in January 2004, Plaintiff Biosensor engaged Thelen, in April 2004, Plaintiff e-Smart engaged Thelen and in August 2006, Plaintiff IVI Smart engaged Thelen, and that particular employees or partners of Thelen dealt directly with Saito.

9

70.    Defendants neither admit nor deny the legal conclusions contained in paragraph 70. To the extent a response is required, Defendants admit that they were aware that Saito served as an officer of one or more of the Plaintiffs. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning whether Saito was a director of one or more of the plaintiffs and as to the nondisclosure or noncompetition agreements referenced in paragraph 70.

71.    Defendants deny the allegations contained in paragraph 71.

72.    Defendants deny the allegations contained in paragraph 72.

73.    Defendants neither admit nor deny the legal conclusions contained in paragraph 73. To the extent a response is required, Defendants deny the allegations contained in paragraph 73.

74.    Defendants neither admit nor deny the legal conclusions contained in paragraph 74. To the extent a response is required, Defendants deny the allegations contained in paragraph 74.

75.    Defendants neither admit nor deny the legal conclusions contained in paragraph 75. To the extent a response is required, Defendants deny the allegations contained in paragraph 75.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint and each separate cause of action asserted therein fail to state a cause of action upon which relief can be granted.

10

1920838v.1

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' own conduct and/or the conduct of third parties caused or contributed to any alleged losses.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs have failed to mitigate their alleged losses.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs waived alleged conflicts of interest.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the relevant statutes of limitations.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of *in pari delicto* and/or unclean hands.

### COUNTERCLAIMS

Defendants, Thelen, by its attorneys, Patterson Belknap Webb & Tyler LLP, allege against Plaintiffs-Counterclaim Defendants e-Smart and IVI Smart the following:

### Jurisdiction

1.     This Court has supplemental jurisdiction over Thelen's state-law counterclaims under 28 U.S.C. § 1367 because Plaintiffs' claims arise under federal patent law and are therefore subject to exclusive federal jurisdiction under 28 U.S.C. § 1338. The allegations in Plaintiffs' Complaint concern the same transactions and occurrences as those referenced in Thelen's counterclaims below.

11

1920838v.1

## The Parties

2.     Thelen is a limited liability partnership engaged in the practice of law with offices in New York, California, Connecticut, New Jersey, the District of Columbia and overseas.

3.     Upon information and belief, Plaintiff and Counterclaim Defendant e-Smart is a Nevada corporation with its principal place of business located at 526 West 26th Street, New York, New York.

4.     Upon information and belief, Plaintiff and Counterclaim Defendant IVI Smart is a Delaware corporation and the parent of e-Smart.

## FIRST COUNTERCLAIM
### Breach of Contract against e-Smart

5.     Thelen and e-Smart entered into a contract in April 2004 whereby e-Smart retained Thelen to perform legal services.

6.     Thelen has fully performed its obligations under its agreement with e-Smart by performing legal services and payments to third parties related to patent prosecution work as agreed to by e-Smart.

7.     Thelen regularly rendered bills to e-Smart for said legal services.

8.     e-Smart has failed to pay Thelen approximately $60,000, or another amount to be proved at trial, that was due pursuant to the contract between Thelen and e-Smart, although Thelen has duly demanded the money.  e-Smart's conduct as described herein constitutes a material breach of its contractual obligations to Thelen.

9.     By reason of the foregoing, Thelen has been damaged in an amount not less than approximately $60,000, or another amount to be proved at trial.

12

1920838v.1

## SECOND COUNTERCLAIM
### Breach of Contract against IVI Smart

10.    Thelen and IVI Smart entered into a contract in August 2006 whereby IVI Smart retained Thelen to perform legal services.

11.    Thelen has fully performed its obligations under its agreement with IVI Smart by performing legal services and payments to third parties related to patent prosecution work as agreed to by IVI Smart.

12.    Thelen regularly rendered bills to IVI Smart for said legal services.

13.    IVI Smart has failed to pay Thelen approximately $60,000, or another amount to be proved at trial, that was due pursuant to the contract between Thelen and IVI Smart, although Thelen has duly demanded the money. IVI Smart's conduct as described herein constitutes a material breach of its contractual obligations to Thelen.

14.    By reason of the foregoing, Thelen has been damaged in the amount of approximately $60,000, or another amount to be proved at trial.

## THIRD COUNTERCLAIM
### Account Stated against e-Smart

15.    Thelen hereby incorporates by reference Paragraphs 1 through 14 above as if set forth fully herein.

16.    e-Smart promised that it would pay for legal services provided by Thelen and payments to third parties related to patent prosecution work as the bills came due.

17.    Thelen kept accounts regarding what e-Smart owed, and e-Smart expressly and impliedly assented to those balances, paying bills from Thelen and not objecting to those bills as they came due.

13

1920838v.1

18.    Thelen has duly demanded that e-Smart pay its outstanding legal bills, but to this date, e-Smart has not paid those outstanding bills.

19.    By reason of the foregoing, Thelen has been damaged in the amount of approximately $60,000 or another amount to be proved at trial.

## FOURTH COUNTERCLAIM
### Account Stated against IVI Smart

20.    Thelen hereby incorporates by reference Paragraphs 1 through 19 above as if set forth fully herein.

21.    IVI Smart promised that it would pay for legal services provided by Thelen and payments to third parties related to patent prosecution work as the bills came due.

22.    Thelen kept accounts regarding what IVI Smart owed, and IVI Smart expressly and impliedly assented to those balances, paying bills from Thelen and not objecting to those bills as they came due.

23.    Thelen has duly demanded that IVI Smart pay its outstanding legal bills, but to this date, IVI Smart has not paid those outstanding bills.

24.    By reason of the foregoing, Thelen has been damaged in the amount of approximately $60,000, or another amount to be proved at trial.

## FIFTH COUNTERCLAIM
### Quantum Meruit against e-Smart

25.    Thelen hereby incorporates its allegations as set forth in Paragraphs 1 through 24 above as if set forth fully herein.

26.    Thelen performed legal services for the benefit of e-Smart in good faith, and at the specific request of e-Smart.

14

1920838v.1

27.    e-Smart accepted such legal services from Thelen on a continuous basis during the relevant time period.

28.    The legal services performed by Thelen and payments Thelen made to third parties related to patent prosecution work were reasonably worth approximately $60,000, or another amount to be proved at trial, and Thelen reasonably expected to receive payment for such services and payments.

29.    Despite Thelen's due demand that e-Smart pay its outstanding debt of approximately $60,000, or another amount to be proved at trial, e-Smart still owes this amount to Thelen.

30.    By reason of the foregoing, Thelen has been damaged in the amount of approximately $60,000, or another amount to be proved at trial.

### SIXTH COUNTERCLAIM
### Quantum Meruit against IVI Smart

31.    Thelen hereby incorporates its allegations as set forth in Paragraphs 1 through 31 above as if set forth fully herein.

32.    Thelen performed legal services for the benefit of IVI Smart in good faith, and at the specific request of IVI Smart.

33.    IVI Smart accepted such legal services from Thelen on a continuous basis during the relevant time period.

34.    The legal services performed by Thelen and payments Thelen made to third parties related to patent prosecution work were reasonably worth approximately $60,000, or another amount to be proved at trial, and Thelen reasonably expected to receive payment for such services and payments.

15

1920838v.1

35. Despite Thelen's due demand that IVI Smart pay its outstanding debt of approximately $60,000, or another amount to be proved at trial, IVI Smart still owes this amount to Thelen.

36. By reason of the foregoing, Thelen has been damaged in the amount of approximately $60,000, or another amount to be proved at trial.

WHEREFORE, Thelen prays for judgment on its counterclaims against Plaintiffs

A. awarding them their damages on their counterclaims in an amount to be determined at trial, currently estimated at $120,000, plus interest at the maximum statutory rate;

B. for an award of costs and reasonable attorneys fees; and

C. for such other and further relief as the Court may deem just and proper.

Dated:     New York, New York
           July 31, 2008

                         PATTERSON BELKNAP WEBB & TYLER LLP

                         By: _____
                              Philip R. Forlenza
                              Michael J. Timmons

                         1133 Avenue of the Americas
                         New York, NY 10036
                         212-336-2000

                         Attorneys for Defendant-Counterclaimant Thelen
                         Reid Brown Raysman & Steiner LLP and Defendant
                         David B. Ritchie

16

1920838v.1

TO:

DREIER LLP

Joel Chernov
Brian Dunefsky
499 Park Avenue
New York, NY 10022
(212) 328-6130

Attorneys for Plaintiffs and
Counterclaim Defendants e-Smart and
IVI Smart

17

**Exhibit 3**


e-SMART Technologies Inc.

1810 Old Oakland Road, Suite F, San Jose, California 95131, USA
Ph: (408) 433-0518   Fax: (408) 433-0618
http://www.e-SmartTechnologies.com

February 20, 2006

MICHAEL GARDINER
President
A Card Company
324 South Cedros Avenue
Solana Beach, California 92075

Dear Michael,

**Re:   Letter of Intent**

e-Smart Technology, Inc. (ESMT) intends to sell key components (to be defined) to A Card Company (A-CARD), and place order (PO) to A-CARD for assembly and turnkey manufacturing services for its Super Smart Cards (PRODUCTS) using such key components.   The purpose of this Letter of Intent is to define the relationship between the companies, to summarize our discussions to date in this regard, and to confirm our respective intentions regarding the proposed transaction.

1. Assembling Super Smart Card includes assembling print circuit boards (PCBs) and selected components (including smt, flip chip die attach, wire bonding) utilizing A-CARD's proprietary assembly and plastic molding techniques and delivering fully functional Super Smart Cards as turn key solution.   The assembly of Super Smart Card also includes testing and quality control.

2. A-CARD will affiliate and further subcontract to NexGen, Onshore, ACL, and/or any other companies (SECONDARY SUBCONTRACTORS), as necessary, to meet competitiveness, quality, and agreed delivery time of the products. A-CARD shall be responsible for all subcontractor management, relationships and performance, and ESMT shall and must be a third-party beneficiary of all subcontractor agreements, including agreements between a subcontractor and a further subcontractor, if any, specifically related to the SUPER SMART CARD with the power to enforce them directly, upon defined and agreed terms of default by A-CARD.

1

3. ESMT retains the right to qualify and approve all Secondary Subcontractors selected by A-CARD for quality, output and overall competitiveness. If a contractor is jeopardizing A-CARD's ability to meet its agreed commitments to ESMT, ESMT has the right to review, and disqualify the subcontractor after giving an agreed time period for rectifying the problem and all reasonable attempts to rectify the problem fail. A-CARD shall be responsible for identifying and qualifying all replacement subcontractors, subject to ESMT's approval.

4. ESMT retains right to qualify the manufacturing of SUPER SMART CARD through Quality Assurance (QA) process which is to be determined.

5. A-CARD assures that A-CARD and all critical Secondary Subcontractor are certified, or are in the process of certification, under ISO 9001 and all industry standard requirements for security chip handling.

6. A-CARD shall be responsible for material and manufacture control, including tracking and security management at the level of financial card certified manufactures. The security management includes background investigation and qualifications of employees, tracking and reporting sub-ppm level key components..

7. ESMT reserves the right to audit by itself or have a third party professional to audit on agreed documentation, materials, components, and product security management of A-CARD regarding the assembly quality controls of Super Smart Cards.

8. ESMT inspects all received products to agreed written criteria, and within an agreed time period either accepts or rejects the products. Payment for the products is subject to ESMT's acceptance after the inspection. ESMT shall issue a written and executed Acceptance Certificate in two original duplicate copies for all received products. Payment to A-Card will require delivery of one such certificate with each payment request on ESMT's bank together with other documents to be agreed.

2

9. ESMT and A Card may agree to set an Acceptable Quality Level (AQL) to qualify the products lot by lot, and if a certain lot does not meet the criteria, ESMT may disqualify such a lot and return to A-Card. A-Card, at its option will repair or replace the disqualified lot(s) of products within an agreed time period for rectify.

10. ESMT's Purchase Order (PO) is subject to the cost, delivery, and quality of the products.

11. ESMT will indicate forecast of coming 9 months, and revises the forecast each month. ESMT places firm order for coming 6 months and issue Letter of Credit to cover such firm orders, and revises the order each month.

12. A-CARD prepares all necessary machines, facility, workers, materials based on ESMT's forecast and purchase order. A-CARD purchases specific defined key components from ESMT, such as CPUs, sensors, which will be separately defined. A-CARD is responsible for damages and/or loss of such key components purchased from ESMT.

13. A-CARD prepares and negotiates all secondary supply contracts and is responsible for payment to all secondary contractors. In addition, A-CARD is responsible for cash flow to purchase materials and equipments, labor, inventory, and necessary up-front payments to secondary contractors, if required.

14. ESMT will be responsible for all agreed costs incurred by A-CARD to support a forecast  if necessary and agreed.

15. A-CARD shall not change any design, material, process, and secondary subcontractors without obtaining ESMT's prior approval in writing.

16. A-CARD credits $100K to ESMT against existing open invoices upon ESMT's signing of this Letter of Intent, and issuing a PO for 300K PCs and a forecast with the intent to purchase three (3) million Super Smart Cards from A-CARD for coming 24-36 months. ESMT considers A-CARD as its primary, if not exclusive, manufacturer of Super Smart Cards, and guarantees that at least 60% of its entire ongoing requirements for Super

Smart Cards are purchased from A-CARD subject to A-CARD's ability to competitively price the product and to meet country origin laws where applicable.

17. Inventions

(a) Title to any invention associated with manufacturing and assembling of Super Smart Cards ("Invention") first conceived or discovered solely by any employee(s) of A-CARD shall vest in A-CARD, except that title shall vest jointly in A-CARD and ESMT if such Invention was first conceived or discovered using materials and/or components provided by ESMT. To the extent that A-CARD has the legal right to do so, A-CARD shall grant ESMT a non-exclusive license to make, use, or sell any such solely-owned Invention on reasonable terms and conditions, including reasonable royalties payable to A-CARD, as the parties mutually agree in separate writing, subject to exceptions set forth below.

EXCEPTION: If Invention is uniquely applicable to a specific process for manufacturing and assembling of Super Smart Cards, or if an invention is a specific application for Super Smart Cards, A-CARD shall grant ESMT an exclusive license to make, use, or sell any such solely-owned Invention on reasonable terms and conditions, including reasonable royalties payable to A-CARD, as the parties mutually agree in separate writing.

(b) Title to Invention first conceived or discovered solely by any employee(s) of ESMT shall vest in ESMT, except that title shall vest jointly in ESMT and A-CARD if such Invention was first conceived or discovered using facilities of or introduced or managed by A-CARD.

(c) In the event that any A-CARD employee(s) first conceives or discovers Invention associated with manufacturing and assembling of Super Smart Cards jointly with ESMT employee(s), title to such Invention shall vest jointly in A-CARD and ESMT. Each party shall possess an undivided one-half interest in such jointly-owned Invention, as well as any corresponding patent rights and the right to make, use or sell such Invention without accounting to the other party, subject to exceptions set forth below.

EXCEPTION: If Invention is uniquely applicable to a specific process for manufacturing and assembling of Super Smart Cards, or if Invention is a specific application for Super Smart Cards, A-CARD shall grant ESMT an exclusive license as to the undivided one-half interest in making, using, or selling any such jointly-owned Invention on reasonable terms and conditions, including reasonable royalties payable to A-Card, as the parties mutually agree in separate writing.

4

(d)    ESMT may request to assign, and A-CARD may assign A-CARD's solely or jointly vested title and rights to Invention to ESMT with reasonable consideration, as the parties mutually agree in separate writing.  ESMT may grant back A-CARD a non-exclusive license as to the assigned Invention.

(e)    ESMT agrees that it will not exercise its title and rights to invention(s) referred to in clause 17, that are associated with A-CARD, to make, use, or sell such invention(s) until purchasing three (3) million Super Smart Cards from A-CARD, subject to Paragraph 23 of this letter, unless agreed otherwise with A-CARD in writing.  However, ESMT, as well as A-CARD, may protect its solely and/or jointly owned title and rights to such invention(s) by filing one or more patent applications and/or taking reasonable steps to protect such invention(s) as trade secret. A-CARD and ESMT agree to cooperate in good faith to protect each other's intellectual property rights.

18. A-CARD shall not provide or solicit development or production of similar biometric smartcards to any third party without prior written consent by ESMT, In the case where ESMT materially fails to provide orders that utilize A-CARD's capabilities and capacities in accordance with agreed forecasts, ESMT will negotiate with A-CARD in good faith to remedy the situation and help mitigate the impact on A-Card's business.

19. A-CARD shall not compete against ESMT directly or indirectly, in the area of biometric smartcard, biometric ID module, biometric security key, or fingerprint sensor for an agreed period of time to be determined, after termination of an agreement with ESMT under this Letter.

20. A-CARD shall create a step-by-step manufacturing process manual and product specifications guide (the "Manual") depicting clearly to a qualified worker or group of workers the exact process for manufacturing and quality control of Super Smart Cards.    This Manual shall be held under strict confidentiality by ESMT and shall be used only as necessary to gain end-user and/or government approval where needed, and/or for ESMT to check standard compliance and quality control of Super Smart Cards manufactured by A-CARD.  The Manual shall be delivered to ESMT as soon as possible and in any event at least thirty days before the first letter of credit is opened by ESMT.  ESMT agrees to treat and protect A-CARD's Proprietary Information provided thereto, with the same care as its own.

5

21. If A-CARD becomes unable to continue manufacturing, or otherwise unable to perform agreed obligations or under certain circumstances such as bankruptcy, death, and legal enforcement, A-CARD shall transfer all necessary technology and/or equipments, including A-CARD's Proprietary Information, to a third party, including ESMT, under agreeable terms and conditions, including licensing fees and/or royalties payable to A-CARD. ESMT will make its best effort, if necessary, to protect A-CARD's Proprietary Information provided thereto under such circumstances. If ESMT becomes unable to buy product from A-CARD, or otherwise unable to perform agreed obligations, ESMT shall negotiate with A-CARD and investigate in good faith all alternatives, including licensing and assignment, to mitigate the impact on A-CARD's manufacturing business.

22. This Letter of Intent is to be replaced by a formal agreement ("Agreement") in a timely manner, subject to ESMT's receiving its initial funding expected in February 2006. The final agreement will contain additional terms and conditions and other elements appropriate for a contractual relationship of this kind in the electronic industry, including, but not limited to, representations and warranties by A-CARD, notices, force majeure, indemnification and liability, termination, intellectual property, confidentiality agreement and other similar provisions, and provisions under Uniform Commercial Code.

23. If for some commercial or strategic reason ESMT desires to have additional or alternative manufacturing sources to A-CARD or otherwise to assign or transfer entirely or partially its manufacturing right of Super Smart Cards to a third party, including a foreign company, during the term of Agreement or upon the termination thereof, A-CARD agrees to negotiate in good faith and work diligently with ESMT to transfer, assign, sell, or license its know-how, logistics, technologies, including A-CARD's Proprietary Information, wholly or jointly owned, and other assets necessary to manufacture Super Smart Cards, to ESMT or to a third party appointed by ESMT, for fair and reasonable compensation, including upfront payment, license fees and/or ongoing royalties, payable to A-CARD. A-CARD agrees that it is willing to support ESMT's preferable business opportunities in any occasion, and both parties agrees to negotiate in good faith so that A-CARD will receive fair and reasonable compensation for its transferring, assigning, selling, or licensing its tangible and/or intangible assets to ESMT or a third-party in support of ESMT's business opportunities.

6

24, Notwithstanding Paragraphs 20 and 23 above, A-CARD may retain, if it desires, its right to continue manufacturing utilizing A-CARD's Proprietary Information, such as assembly techniques and molding processes, in areas not in competition with ESMT's current biometric Smart Card business, as outlined in clause 19, under the terms and conditions to be agreed in separate writing.

25.    If any of A-CARD's Proprietary Information, wholly or jointly owned, and its right thereto are entirely transferred, sold, or assigned to ESMT or a third party appointed by ESMT, ESMT agrees to negotiate in good faith to license back, at no cost to A Card, such Proprietary Information to A-CARD in order for A-CARD to continue its manufacturing business and/or to utilize A-CARD's Proprietary Information in areas not in competition with ESMT's business, under the terms and conditions to be agreed in separate writing.

26.   Any and all license fees and royalties associated with Agreement which are agreed in separate writing are bound by their own terms and conditions in the separate writing.

Signed on Behalf of:

A Card Company                      E-Smart Technologies, Inc

_____            _____
Michael Gardiner                    Tamio Saito
President                           CTO

7